No. 25-8057

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

CRUISE LINES INTERNATIONAL ASSOCIATION, INC.;
HONOLULU SHIP SUPPLY CO.; KAUA'I KILOHANA PARTNERS;
ALOHA ANUENUE TOURS LLC,

*Plaintiffs-Appellants,*

UNITED STATES OF AMERICA,

*Intervenor-Plaintiff,*

v.

GARY S. SUGANUMA; HAWAI'I DEPARTMENT OF TAXATION; CHELSIE SAKAI;
COUNTY OF KAUA'I; ANDREW T. KAWANO; CITY AND COUNTY OF HONOLULU;
MARCY MARTIN; COUNTY OF MAUI; DIANE NAKAGAWA; COUNTY OF HAWAI'I,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Hawai'i,
No. 1:25-cv-367-JAO-KJM (Judge Jill A. Otake)

## APPELLANTS' OPENING BRIEF

| | |
|---|---|
| Jeffrey S. Portnoy | Bradley J. Bondi |
| Trever K. Asam | Benjamin W. Snyder |
| Lindsay N. McAneeley | Ronald K. Anguas, Jr. |
| CADES SCHUTTE LLP | Joseph C. Schroeder |
| 1000 Bishop Street, Suite 1200 | PAUL HASTINGS LLP |
| Honolulu, HI 96813 | 2050 M Street, NW |
| (808) 521-9200 | Washington, DC 20036 |
| | (202) 551-1700 |
| | bensnyder@paulhastings.com |

*Counsel for Plaintiffs-Appellants*

## DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellants make the following disclosures:

Alpex Holdco Inc. is the parent company of Appellant Honolulu Ship Supply Co. None of the other Appellants has a parent corporation.

No publicly held entity owns 10% or more of the stock of any Appellant.

i

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................iv

INTRODUCTION .............................................................................1

JURISDICTIONAL STATEMENT.......................................................6

STATEMENT OF THE ISSUES .........................................................7

CONSTITUTIONAL AND STATUTORY AUTHORITIES.........................8

STATEMENT OF THE CASE ............................................................8

    A.    Act 96's New Tax, Registration Fees, And Compelled-Speech Requirements For Cruise-Ship Operators. ...................................8

    B.    Proceedings Below .............................................................13

SUMMARY OF THE ARGUMENT......................................................20

STANDARD OF REVIEW .................................................................24

ARGUMENT ..................................................................................25

I.    CLIA IS LIKELY TO SUCCEED IN SHOWING THAT ACT 96 VIOLATES THE RIVERS AND HARBORS ACT, THE TONNAGE CLAUSE, AND THE FIRST AMENDMENT...............25

    A.    The Rivers And Harbors Act Preempts Act 96............................26

    B.    The Tonnage Clause Also Prohibits Hawai'i's Taxation Of Cruise Ships For Time Spent In Hawai'i Ports. ..........................38

    C.    Given Act 96's Invalidity Under The Rivers And Harbors Act And Tonnage Clause, It Is Likely That CLIA Will Prevail On Its First Amendment Claim, Too.................................................47

II.    THE DISTRICT COURT ERRED IN DECLINING TO EXERCISE JURISDICTION OVER PRIVATE PLAINTIFFS' OTHER CLAIMS. ..................................................................48

    A.    The Doctrine Of Third-Party Standing Provides No Basis For Refusing To Hear The Hawai'i-Based Plaintiffs' Claims. ....49

    B.    The Tax Injunction Act Does Not Bar CLIA's Challenges To The Cruise-Ship Tax. .................................................56

III.   THE REMAINING PRELIMINARY-INJUNCTION FACTORS
       HEAVILY FAVOR RELIEF. ...............................................................61

       A.   Plaintiffs Face Irreparable Harm. ......................................61

       B.   The Equities And The Public Interest Favor Relief. ...................64

CONCLUSION...................................................................................66

iii

# TABLE OF AUTHORITIES

Page(s)

CASES

*Air Polynesia, Inc. v. Freitas,*
   742 F.2d 546 (9th Cir. 1984) .................................................................61

*Ali v. Fed. Bureau of Prisons,*
   552 U.S. 214 (2008) ..............................................................................32

*Altria Grp., Inc. v. Good,*
   555 U.S. 70 (2008) ................................................................................31

*American Ass'n of Univ. Professors v. Trump,*
   No. 25-CV-07864-RFL, 2025 WL 3187762 (N.D. Cal. Nov. 14, 2025).........64

*American Beverage Ass'n v. City & County of San Francisco,*
   916 F.3d 749 (9th Cir. 2019) .................................... 4, 8, 16, 26, 47, 62

*American Trucking Ass'ns, Inc. v. City of Los Angeles,*
   559 F.3d 1046 (9th Cir. 2009) ..............................................................64

*Andrus v. Glover Constr. Co.,*
   446 U.S. 608 (1980) ..............................................................................28

*Arc of California v. Douglas,*
   757 F.3d 975 (9th Cir. 2014) ..................................................................6

*Baird v. Bonta,*
   81 F.4th 1036 (9th Cir. 2023) .........................................................64, 65

*Biden v. Nebraska,*
   600 U.S. 477 (2023).........................................................................49, 50

*Bond v. United States,*
   564 U.S. 211 (2011).....................................................................53, 54, 55

*BP p.l.c. v. Mayor & City Council of Baltimore,*
   141 S. Ct. 1532 (2021) ............................................................................6

*City of Chicago v. Wendella Sightseeing, Inc.,*
   143 N.E.3d 771 (Ill. App. Ct. 2019) .....................................................27

*Clyde Mallory Lines v. Alabama ex rel. State Docks Comm'n,*
   296 U.S. 261 (1935).........................................................3, 7, 22, 38, 39

*Collins v. Yellen*,
594 U.S. 220 (2021)................................................................54, 55

*Colorado River Water Conservation Dist. v. United States*,
424 U.S. 800 (1976)......................................................................52

*E. Bay Sanctuary Covenant v. Biden*,
993 F.3d 640 (9th Cir. 2021)........................................................63

*EEOC v. Luce, Forward, Hamilton & Scripps*,
345 F.3d 742 (9th Cir. 2003)........................................................33

*EEOC v. Peabody W. Coal Co.*,
773 F.3d 977 (9th Cir. 2014).......................................................28

*Ex parte Young*,
209 U.S. 123 (1908).......................................................................15

*Feldman v. Arizona Sec'y of State's Off.*,
843 F.3d 366 (9th Cir. 2016)........................................................20

*Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*,
98 F.4th 1180 (9th Cir. 2024) ......................................................25

*Georgia R.R. & Banking Co. v. Redwine*,
342 U.S. 299 (1952)................................................................60, 61

*High Country Adventures, Inc. v. Polk County*,
No. E2007-02678-COA-R3-CV, 2008 WL 4853105
(Tenn. Ct. App. Nov. 10, 2008) ...................................................30

*Hubbard v. City of San Diego*,
139 F.4th 843 (9th Cir. 2025) ......................................................24

*Hyatt v. Yee*,
871 F.3d 1067 (9th Cir. 2017).......................................57, 58, 59, 60

*In re Gerwer*,
898 F.2d 730 (9th Cir. 1990)........................................................33

*In re Hokulani Square, Inc.*,
776 F.3d 1083 (9th Cir. 2015).....................................................34

*Inman S.S. Co. v. Tinker*,
94 U.S. 238 (1877).......................................................................53

*Kittatinny Canoes, Inc. v. Westfall Township*,
No. 183 CV 2013, 2013 WL 8563483 (Pa. Com. Pl. May 6, 2013)...........29, 30

*Knox v. Brnovich,*
907 F.3d 1167 (9th Cir. 2018) ................................................21, 31

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
572 U.S. 118 (2014) ................................................................52, 55

*Lil' Man in the Boat, Inc. v. City & County of San Francisco,*
5 F.4th 952 (9th Cir. 2021) .............................................................54

*Maher Terminals, LLC v. Port Auth. of New York & New Jersey,*
805 F.3d 98 (3d Cir. 2015) .......................................................55, 56

*Moore v. Urquhart,*
899 F.3d 1094 (9th Cir. 2018)........................................................16

*Moscheo v. Polk County,*
No. E2008-01969-COA-R3-CV, 2009 WL 2868754
(Tenn. Ct. App. Sept. 2, 2009)........................................................30

*Nat'l Ass'n of Wheat Growers v. Bonta,*
85 F.4th 1263 (9th Cir. 2023) ...........................................24, 47, 62

*Polar Tankers, Inc. v. City of Valdez,*
557 U.S. 1 (2009)...........................3, 17, 37, 39, 40, 41, 42, 43, 46, 53

*Power Probe Grp., Inc. v. Innova Elecs., Corp.,*
No. 2:21-CV-00332-GMN-EJY, 2023 WL 7043388
(D. Nev. Oct. 25, 2023).................................................................64

*Reel Hooker Sportfishing, Inc. v. State, Dep't of Tax'n,*
236 P.3d 1230 (Haw. Ct. App. 2010)..............................................35

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.,*
487 U.S. 781 (1988).....................................................................47

*Rodriguez v. Robbins,*
715 F.3d 1127 (9th Cir. 2013).......................................................65

*Rosewell v. LaSalle Nat'l Bank,*
450 U.S. 503 (1981).....................................................................58

*S.S. Co. v. Portwardens,*
73 U.S. (6 Wall.) 31 (1867)...........................................................53

*Seila Law LLC v. CFPB,*
591 U.S. 197 (2020).....................................................................53

vi

*Sprint Commc'ns, Inc. v. Jacobs,*
571 U.S. 69 (2013)................................................................................51

*Starbucks Corp. v. McKinney,*
602 U.S. 339 (2024)........................................................................24, 61

*State v. N. Pac. Fishing, Inc.,*
485 P.3d 1040 (Alaska 2021) ..............................................................35

*State Tonnage Tax Cases,*
79 U.S. (12 Wall.) 204 (1871)..............................................................39

*Tapia v. United States,*
564 U.S. 319 (2011)..............................................................................26

*Tyler v. Hennepin County,*
598 U.S. 631 (2023)..............................................................................50

*United States v. Locke,*
529 U.S. 89 (2000)................................................................................31

*Warth v. Seldin,*
422 U.S. 490 (1975)..............................................................................54

*Washington v. Trump,*
145 F.4th 1013 (9th Cir. 2025) ......................................................48, 63

*Wendella Sightseeing Co. v. City of Chicago,*
226 N.E.3d 636 (Ill. App. Ct. 2023) ..............................2, 22, 28, 29, 33, 36

*Winter v. Nat'l Res. Def. Council, Inc.,*
555 U.S. 7 (2008)..................................................................................20

STATUTES

28 U.S.C. § 1292 ......................................................................................6

28 U.S.C. § 1331 ......................................................................................6

33 U.S.C. § 5 .................................. 1, 2, 7, 14, 17, 21, 26, 27, 28, 34, 37

33 U.S.C. § 2236 ....................................................................................27

Haw. Act 96 (2025) ............................................................3, 9, 11, 39, 44

Haw. Cnty. Code § 2-259.........................................................................9

Haw. Cnty. Code § 2-265.......................................................................59

HRS § 232-14.5......................................................................................57

HRS § 235-114 ........................................................................57

HRS § 237D-2.5 .........................................................................9

HRS § 237D-4 ......................................................................12, 39

HRS § 237D-6 ...........................................................................57

HRS § 237D-9 ...........................................................................57

HRS § 237D-10 .........................................................................57

HRS § 237D-11 .........................................................................57

Kauaʻi Cnty. Code § 5-4.1 ..........................................................9

Kauaʻi Cnty. Code § 5-4.12 .......................................................59

Maui Cnty. Code § 3.47.010 ........................................................9

Maui Cnty. Code § 3.47.120 ......................................................59

Rev. Ord. Hon. § 8A-1.1 .............................................................9

Rev. Ord. Hon. § 8A-1.16 .........................................................59

REGULATIONS

33 C.F.R. § 329.4 .....................................................................27

46 C.F.R. § 15.301 (2002) .........................................................27

HAR § 18-237D-1-03 ........................................................10, 44, 45

LEGISLATIVE MATERIALS

148 Cong. Rec. E2143-44 (2002) ...............................................34

Hearing on S.B. 1396 Before the H. Comm. on Fin., 2025 Leg.,
    33d Sess. (Haw. 2025) (statement of Caroline Anderson,
    Interim President & CEO, Haw. Tourism Auth.),
    https://perma.cc/9TW8-KFJV .................................................51

CONSTITUTIONAL PROVISION

U.S. Const. Art. I, § 10, cl. 3 ...............................................38, 40

OTHER AUTHORITIES

American plan (noun), Merriam-Webster Dictionary Online,
    https://www.merriam-webster.com/dictionary/American%20plan.............44

Erik M. Jensen, *Quirky Constitutional Provisions Matter:
    The Tonnage Clause,* Polar Tankers*, and State Taxation of
    Commerce*, 18 Geo. Mason L. Rev. 669 (2011) ...............................................53

Hawaiʻi Department of Taxation Announcement No. 2025-08
    (Dec. 15, 2025), https://perma.cc/URN4-M8P6..............................................11

Jud. Conf. of the United States, *National Judicial Caseload Profile*,
    Hawaii (Mar. 2025), https://perma.cc/HHN3-QNHC...................................57

operating (adjective), Merriam-Webster Dictionary Online,
    https://www.merriamwebster.com/dictionary/operating............................27

## INTRODUCTION

This appeal concerns a recent Hawaiʻi statute that, if permitted to take effect, would impose fees and massive new taxes on the operators of cruise ships that dock at any port in Hawaiʻi. To facilitate that new tax regime, the law—known as Act 96—also would compel cruise-ship operators to include government-scripted messages in all advertisements for Hawaiʻi-bound cruises, wherever in the world those advertisements appear.

In December, the U.S. District Court for the District of Hawaiʻi found that there are "serious questions" about whether Act 96 violates the Tonnage Clause of the U.S. Constitution, the First Amendment, and the Rivers and Harbors Appropriation Act of 1884 ("Rivers and Harbors Act" or "RHA"), 33 U.S.C. § 5(b). 1-ER-55. The court nevertheless denied a pair of preliminary-injunction motions filed by the federal government and a group of private plaintiffs, concluding that it was not sufficiently certain of Act 96's unconstitutionality to grant relief before the law went into effect on January 1, 2026.

That denial of relief was erroneous, as this Court already has suggested by entering its own injunction barring enforcement of Act 96 while this appeal proceeds. Beginning with the statutory question, the Rivers and Harbors Act

1

generally prohibits States from levying "taxes, tolls, operating charges, fees, or any other impositions whatever" on vessels operating in the navigable waters of the United States. 33 U.S.C. § 5(b). That prohibition unambiguously preempts Act 96, which requires vessel operators to pay taxes and fees for the right to operate accommodations in the navigable waters of Hawai'i's ports. And while the RHA contains three express exceptions, all agree that none of them applies here. Relying heavily on legislative history and a pair of non-binding decisions that construed the RHA narrowly, however, the district court created an unwritten fourth exception, holding that Act 96 likely is permissible because it levies a tax upon "the income from the business offered to the [vessel's] passengers" rather than the vessel itself. 1-ER-76. That reasoning is indefensible. As another court recently observed in rejecting an identical argument, allowing a State to avoid the RHA's prohibitions by framing a tax as one on the vessel operator's revenue, as opposed to the vessel, "would render the statute 'rather toothless, indeed meaningless,' and thus 'contrary to the express wishes of Congress.'" *Wendella Sightseeing Co. v. City of Chicago*, 226 N.E.3d 636, 645 (Ill. App. Ct. 2023) (citation omitted).

Act 96 also violates the Tonnage Clause, which gives Congress (not States) exclusive power to authorize "charge[s] for the privilege of entering,

2

trading in, or lying in a port." *Clyde Mallory Lines v. Alabama ex rel. State Docks Comm'n*, 296 U.S. 261, 265-66 (1935). Act 96 establishes just such charges: a one-time fee imposed as a precondition to operating a cruise ship in port, and taxes calculated based on a ship's "days docked at any port in the State." Act 96 § 5.1. The district court nevertheless concluded that the law is likely constitutional because its taxation of cruise ships is similar to Hawaiʻi's pre-existing taxation of hotels. That was doubly incorrect. First, as Chief Justice Roberts and Justice Thomas have explained, any such similarity would not excuse Act 96 from the Tonnage Clause's requirement of congressional approval for taxes on vessels. *See Polar Tankers, Inc. v. City of Valdez*, 557 U.S. 1, 18 (2009) (Roberts, C.J., joined by Thomas, J., concurring in part and concurring in the judgment). And second, even assuming that a showing of non-discriminatory treatment *could* save the law, Act 96 taxes cruise ships based on substantial categories of expenses—transportation, meals, and beverages—that are not taxed in the context of land-based accommodations. Under any colorable view of the Tonnage Clause, that disparate treatment renders Act 96 unconstitutional.

Act 96's incompatibility with the Rivers and Harbors Act and Tonnage Clause gives rise to a First Amendment problem, too. As the district court

3

itself recognized, "[i]f Act 96's charges are indeed violations of the Constitution or the RHA," then the related compelled-speech requirement also is "impermissible . . . because there is no substantial interest in compelling speech related to an unconstitutional law." 1-ER-50; *see American Beverage Ass'n v. City & County of San Francisco*, 916 F.3d 749, 755 (9th Cir. 2019) (en banc) (compelled disclosures in the commercial-speech context must be "'reasonably related' to a substantial governmental interest" (citation omitted)).

Once this Court corrects the district court's erroneous view of the merits, there is little dispute that the private plaintiffs and federal government are entitled to a preliminary injunction barring enforcement of Act 96's cruise-ship-related provisions while this case proceeds. Indeed, given this Court's strong presumption in favor of enjoining laws likely to be found unconstitutional, even the district court appeared to agree that an injunction would be appropriate if plaintiffs established a likelihood of success on the merits. This Court should therefore reverse the district court's denial of the preliminary-injunction motions and remand with instructions to enjoin enforcement of Act 96 against cruise-ship operators pending final judgment.

Separately, this Court also should reverse the district court's jurisdictional dismissal of a subset of the claims brought by the private plaintiffs. While agreeing that it had jurisdiction to consider the private plaintiffs' challenges to Act 96's fees and compelled-speech provisions, the court concluded that under third-party-standing principles and the Tax Injunction Act, 28 U.S.C. § 1341, only the federal government—not the private plaintiffs—could challenge the law's central tax. That was error. Contrary to the court's third-party-standing analysis, the local Hawai'i businesses that have challenged the tax are seeking to enforce their *own* legal rights, not the rights of cruise lines or other third parties. And the Tax Injunction Act does not bar the claims brought by Cruise Lines International Association, Inc. (CLIA), a trade association representing cruise-line operators, because Hawai'i does not afford CLIA's cruise-line members a "plain, speedy and efficient" mechanism for challenging the tax in state court. 28 U.S.C. § 1341. This Court therefore should reverse those dismissals and clarify that the private plaintiffs—not just the federal government—are entitled to pursue their challenge to Act 96's cruise-ship tax on the merits.

5

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. § 1331. Although the court concluded that third-party-standing principles and the Tax Injunction Act, 28 U.S.C. § 1341, stripped it of jurisdiction to consider a subset of the claims brought by the private plaintiffs, that determination was incorrect for reasons discussed below. *See* pp. 45-57, *infra*.

This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1), which provides that "the courts of appeals shall have jurisdiction of appeals from . . . [i]nterlocutory orders . . . granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions." *Id.* The district court issued a single order denying a preliminary injunction and dismissing certain of the private plaintiffs' claims on December 23, 2025. *See* 1-ER-2-81. The private plaintiffs timely filed a notice of appeal the same day. 2-ER-328-330.[1]

---

[1] Because the district court dismissed a subset of the private plaintiffs' claims in the same order in which it denied their motion for a preliminary injunction, and because the dismissal of those claims is "inextricably intertwined" with its resolution of the preliminary-injunction motion, this Court has jurisdiction to review the claim dismissals as well as the preliminary-injunction denial. *Arc of California v. Douglas*, 757 F.3d 975, 993 (9th Cir. 2014) (reviewing dismissals "inextricably intertwined" with denial of a preliminary injunction); *see BP p.l.c. v. Mayor & City Council of Baltimore*, 141 S. Ct. 1532, 1538 (2021) (holding that where Congress authorizes

6

## STATEMENT OF THE ISSUES

1.      Whether it is at least likely that the Rivers and Harbors Act's prohibition of non-federal "taxes," "fees," and "any other impositions whatever" on "vessel[s]" that are "operating on . . . navigable waters subject to the authority of the United States," 33 U.S.C. § 5(b), bars Act 96's imposition of taxes and fees on the operation of cruise ships in Hawaiʻi ports, where it is undisputed that Act 96's taxes and fees do not fall within any of the Rivers and Harbors Act's express exceptions.

2.      Whether it is at least likely that Act 96's imposition of taxes and fees on cruise ships based on their time spent in Hawaiʻi ports violates the Tonnage Clause of the U.S. Constitution, which the Supreme Court has held requires congressional approval for all "charge[s] for the privilege of entering, trading in, or lying in a port." *Clyde Mallory Lines v. Alabama ex rel. State Docks Comm'n*, 296 U.S. 261, 265-66 (1935).

3.      Whether it is at least likely that Act 96's requirements that cruise-ship operators engage in government-scripted speech to facilitate its unconstitutional and preempted tax violate the First Amendment, given this

---

interlocutory review of an "order," the "court of appeals [may] review each and every" issue resolved in that order, "not just some of its parts or pieces").

Court's recognition that compelled disclosures in the commercial-speech context must be "'reasonably related' to a substantial governmental interest." *American Beverage Ass'n v. City & County of San Francisco*, 916 F.3d 749, 755 (9th Cir. 2019) (en banc) (citation omitted).

4. Whether the district court erred in holding that it lacked jurisdiction over a subset of the private plaintiffs' claims under principles of third-party standing and the Tax Injunction Act, 28 U.S.C. § 1341.

## CONSTITUTIONAL AND STATUTORY AUTHORITIES

Pertinent constitutional and statutory provisions are reproduced in an addendum to this brief.

## STATEMENT OF THE CASE

### A. Act 96's New Tax, Registration Fees, And Compelled-Speech Requirements For Cruise-Ship Operators.

On May 27, 2025, Hawai'i Governor Joshua B. Green signed Act 96 into law. *See* Add. 3-8. Act 96 imposes a series of novel requirements on cruise ships, which were scheduled to take effect on January 1, 2026.

*Tax on Cruise Fares*: Act 96's primary provision is a new tax on cruise-ship fares. Act 96 amends Chapter 237D of the Hawai'i Revised Statutes ("HRS") to add an 11% tax "on all gross rental proceeds derived from cruise fares prorated by the percentage of days docked at any port in the State in

comparison to the total number of days of the voyage." Act 96 § 5.1. That amendment also triggers additional 3% county-level taxes in Kauaʻi, Maui, Hawaiʻi, and Honolulu (collectively, the "Counties"), imposed on "gross rental proceeds" from properties within their jurisdictions that are covered by Chapter 237D. HRS § 237D-2.5; *see* Kauaʻi Cnty. Code § 5-4.1; Maui Cnty. Code § 3.47.010; Haw. Cnty. Code § 2-259; Rev. Ord. Hon. § 8A-1.1; *see* 1-ER-7.

Cumulatively, therefore, Act 96 authorizes a 14% tax on the prorated portion of cruise fares for voyages docking in Hawaiʻi ports. Responsibility for paying those taxes rests on the "operator[s] of . . . cruise ship[s]," Act 96 § 5.1, though Hawaiʻi has indicated that it expects "99%" of the taxes to be passed along to passengers, 2-ER-299-300 & n.8. The taxes are required to be "paid into the state treasury each month." Act 96 § 6.

Although framed as an amendment to Hawaiʻi's existing transient accommodations tax, the new 14% cruise-ship tax goes beyond any tax that Hawaiʻi imposes on land-based accommodations. Act 96 defines "[c]ruise fare" to "mean[] the total amount paid . . . for a cruise ship cabin on a cruise ship, inclusive of any mandatory fees imposed . . . for the use of shipboard services, facilities, meals, and onboard entertainment." Act 96 § 4.1. That expansive

definition captures significantly more than the value of a passenger's cabin. "Much of the value of a cruise fare relates to additional products and experiences included in that fare," including the entertainment and meals that Act 96 explicitly covers. 2-ER-254. By taxing the entire cruise fare, Act 96 "charge[s] for value far beyond that provided by mere accommodations." 2-ER-169.

By contrast, Hawaiʻi explicitly authorizes all-inclusive hotels to exclude from their tax base "[c]harges for guest amenities," such as "meals" and "beverages." Hawaiʻi Administrative Rules ("HAR") § 18-237D-1-03(c)(3). Regulations promulgated by the Hawaiʻi Department of Taxation include an "example" illustrating that exclusion for land-based accommodations:

> Example 4. Paradise Hotel rents a room to Ms. Mainland on January 1, 1999, under the American Plan and charges Ms. Mainland $200. To compute the transient accommodations tax, Paradise shall deduct the cost of meals from the total price charged Ms. Mainland. If the cost reasonably attributed to meals is $50, then the cost of the room is $150.

*See id.* Below, counsel for the Department of Taxation therefore acknowledged that Hawaiʻi uses "a different definition [of gross rental proceeds for] the land-based accommodations" than it does for cruise ships. 2-ER-122.

10

Also unlike existing taxes on hotels, Act 96's cruise-ship tax applies to the cost of transportation. Cruise ships offer "exceptional value in the form of transportation, often including transportation to multiple destinations as part of the same cruise fare." 2-ER-267. The *Pride of America* cruise ship operated by CLIA member Norwegian Cruise Lines (NCL), for example, offers "7-day and 11-day cruises around Hawai'i's islands, stopping in ports on each of Oahu, Maui, Kauai'i, and Hawai'i, all in one voyage." 2-ER-169. Under guidance issued by the Hawai'i Department of Taxation, Act 96's tax on all "mandatory fees" paid by cruise-ship passengers, Act 96 § 4.1, necessarily would apply to the entire portion of the *Pride of America* fare that goes toward that transportation. *See* Hawai'i Department of Taxation Announcement No. 2025-08 (Dec. 15, 2025), https://perma.cc/URN4-M8P6 (providing example showing that even when a cruise ship spends part of a day transiting between Hawai'i ports, the full fare attributable to that day is subject to taxation). No Hawai'i law imposes any similar tax on hotels in connection with their customers' interisland flights or transportation to Hawai'i.

*Registration Fees & Registration Requirements*: Under Act 96, cruise-ship operators also will be required to pay a registration fee as a prerequisite to operating in Hawai'i ports. Specifically, the law subjects cruise-ship

11

operators to a requirement that, as "a condition precedent to engaging or continuing in the business of furnishing transient accommodations" in port, they "register with the [Director of the Hawai'i Department of Taxation] the name and address of each [covered] place of business" and "make a one-time payment" of "$15 for each registration for transient accommodations consisting of six or more units." HRS § 237D-4(a)(2). If the law is allowed to take effect, therefore, a cruise-ship operator will be required to register each of its cruise ships with the Director and pay the required registration fees before its ships can dock in the State.

*Compelled-Speech Requirements*: Finally, Act 96 compels cruise-ship operators to engage in speech in two contexts. *First*, cruise-ship operators must "conspicuously display[]" information about their registration on each of their ships. HRS § 237D-4(b). *Second*, cruise-ship operators must include "[t]he registration identification number or an electronic link to the registration identification number" in "[a]ny advertisement, including an online advertisement," for cruises that dock in Hawai'i. HRS § 237D-4(c). Hawai'i has acknowledged that the purpose of those requirements is "ensuring compliance" with the 14% tax. ECF No. 59, at 14 (Oct. 17, 2025).

12

B. **Proceedings Below**

1. On August 27, 2025, a group of private plaintiffs—three Hawaiʻi businesses that depend heavily on cruise traffic (the "Hawaiʻi-based Plaintiffs") and CLIA (together, "Private Plaintiffs")—filed suit against the Hawaiʻi Department of Taxation, the Counties, and the state and county officials charged with enforcing Act 96's cruise-ship provisions. *See* 2-ER-288-324. All of the Private Plaintiffs challenged Act 96's cruise-ship tax on the ground that it violates the Rivers and Harbors Act and the Tonnage Clause. *See* 2-ER-313-320. CLIA (but not the Hawaiʻi-based Plaintiffs) raised a similar challenge to the registration fees, and also challenged the compelled-speech requirements on First Amendment grounds, explaining that Hawaiʻi has no substantial interest in ensuring compliance with an unconstitutional tax and therefore cannot force cruise-line operators to engage in speech for that purpose. *See* 2-ER-320-321. The same day, Private Plaintiffs moved for a preliminary injunction, submitting declarations showing that enforcement of Act 96 will violate the First Amendment rights of CLIA's members and cause irreparable business harms that cannot be recovered fully after final judgment because of sovereign immunity. *See* ECF Nos. 28, 28-1 (Aug. 27, 2025); 2-ER-244-287; 2-ER-166-173.

13

Defendants opposed the preliminary-injunction motion and moved to dismiss Private Plaintiffs' claims, relying primarily on procedural objections. *See* ECF No. 53 (Sept. 19, 2025); ECF No. 55 (Sept. 26, 2025). They argued, among other things, that (i) the Tax Injunction Act, 28 U.S.C. § 1341, precludes federal courts from enjoining the collection of state taxes in suits brought by private parties; and that (ii) because the Rivers and Harbors Act lacks a private right of action, private parties may not seek judicial assistance in enforcing the RHA's ban on "taxes, . . . fees, or any other impositions whatever" levied by States or municipalities on "any vessel . . . operating on any navigable waters subject to the authority of the United States," 33 U.S.C. § 5(b). *See, e.g.*, ECF No. 55, at 2-8, 17-18.

2.  Following Defendants' assertion that Private Plaintiffs cannot enforce the Rivers and Harbors Act or otherwise obtain relief in federal court, the United States intervened as a plaintiff in order to protect its interests in ensuring compliance with the Constitution and the supremacy of federal laws. *See* ECF No. 69-1 (Nov. 13, 2025) (motion to intervene); 2-ER-145-154 (order granting intervention). The United States also filed its own motion for a preliminary injunction, asking the district court to enjoin enforcement of Act 96's cruise-ship tax and registration fees. ECF No. 97 (Dec. 10, 2025).

14

3. On December 23, 2025, the district court entered an order denying the preliminary-injunction motions filed by Private Plaintiffs and the United States (together, "Plaintiffs"); dismissing some of Private Plaintiffs' claims on jurisdictional grounds; and denying Defendants' Rule 12(b)(6) motion as to Private Plaintiffs' other claims. *See* 1-ER-2-81.

Rejecting most of Defendants' procedural arguments, the district court found that it had jurisdiction to hear: (i) CLIA's First Amendment challenge to the compelled-speech requirements; (ii) CLIA's Tonnage Clause and Rivers and Harbors Act challenges to the registration fees; and (iii) the United States' Tonnage Clause and Rivers and Harbors Act challenges to both the cruise-ship tax and the registration fees. 1-ER-37-48. The court held that the Tax Injunction Act did not bar review of those claims because Hawaiʻi offers no "plain, speedy and efficient" mechanism for adjudicating them in state court. 28 U.S.C. § 1341; *see* 1-ER-41-42. The district court also rejected other procedural objections raised by Defendants, holding that CLIA has associational standing and that Private Plaintiffs can seek equitable relief on their Rivers and Harbors Act preemption claims under *Ex parte Young*, 209 U.S. 123 (1908), even though the RHA does not contain a private right of

15

action.  *See* 1-ER-51 (citing *Moore v. Urquhart*, 899 F.3d 1094, 1103 (9th Cir. 2018)).

Turning to the merits, the district court described the case as a "close call" and "recognize[d] there are serious questions as to whether Act 96's State Tax, County Surcharges, and Registration Fee violate the Tonnage Clause or are preempted by the RHA."  1-ER-55, 1-ER-70.  The court also agreed that "[i]f Act 96's charges are indeed violations of the Constitution or the RHA, CLIA plausibly alleges that the Notice Requirements constitute impermissible compelled speech because there is no substantial interest in compelling speech related to an unconstitutional law."  1-ER-50 (citing *American Beverage Ass'n*, 916 F.3d at 756).[2]  The court thus declined to dismiss any of those challenges under Rule 12(b)(6), acknowledging that it might ultimately hold that the relevant provisions of Act 96 are unconstitutional or preempted.  *See* 1-ER-5-6, 1-ER-48-54.

---

[2]  The district court elsewhere commented that CLIA's First Amendment claim "derives entirely from CLIA's Tonnage Clause challenge."  1-ER-42. But CLIA consistently maintained—as the court's statement above reflects— that if Act 96 violates the Rivers and Harbors Act, that violation provides an independent basis to rule in favor of CLIA on its First Amendment claim.  *See* ECF No. 56, at 24 n.5 (Oct. 6, 2025).

16

The district court concluded, however, that Plaintiffs had not established a sufficient likelihood of success to warrant a preliminary injunction. *See* 1-ER-54-77. On the Tonnage Clause claims, the court understood dicta in *Polar Tankers, Inc. v. City of Valdez*, 557 U.S. 1 (2009), to suggest a focus on whether the challenged charges on a vessel are comparable to charges imposed on land-based property. 1-ER-63. And while the court acknowledged "differences in how [Hawaiʻi's] tax is calculated for cruises vs. land-based accommodations," it concluded that it was not "persuade[d] . . . at this early stage that the differential treatment functions as per se discrimination." *Id.*

On the Rivers and Harbors Act claims, the district court held that reading the statute literally to prohibit all non-federal "impositions" on any "vessel . . . operating on any navigable waters subject to the authority of the United States," 33 U.S.C. § 5(b), would "lead to absurd results and prevent any taxes whatsoever (e.g., general business or sales taxes) on any boat that ever spent time in one of Hawaii's ports," 1-ER-72. The court therefore concluded that the RHA contains an implicit exception for "generally applicable" taxes that are based "on the income from the business offered to the passengers" rather than on the vessel or passengers themselves. 1-ER-76. In support of that implicit exception, the court pointed to the "general

17

presumption that Congress does not intend to preempt state law," 1-ER-71, as well as one legislator's statement that adoption of the RHA was intended to address the problem of local jurisdictions taxing vessels that were "merely transiting or making innocent passage through navigable waters" bordering the locality, 1-ER-74 (citation and emphasis omitted).

Having concluded that the Tonnage Clause and Rivers and Harbors Act claims were not sufficiently likely to succeed, the district court decided that the First Amendment challenge based on those claims also was unlikely to succeed. 1-ER-77. Similarly, while acknowledging that Plaintiffs likely could establish irreparable harm if they showed that Act 96 is unconstitutional, the court concluded that its doubts about the merits of the constitutional claims meant that Plaintiffs had not "demonstrate[d] a *likelihood* of irreparable harm." *Id.* The court therefore denied the preliminary-injunction motions. 1-ER-80-81.

Finally, although the district court rejected most of Defendants' procedural objections, it granted their Rule 12(b)(1) motion to dismiss Private Plaintiffs' (but not the United States') direct challenges to the cruise-ship tax. Addressing the Hawaiʻi-based Plaintiffs first, the court acknowledged that they had established Article III standing by showing that Act 96 likely would

18

harm their businesses—which depend in whole or in part on cruise ships and cruise-ship passengers—by "depress[ing] cruise business and on-shore spending." 1-ER-20-21. But while recognizing that the Hawaiʻi-based Plaintiffs had "allege[d] their own *harms*," the court concluded that they were relying on the "legal *rights* of the cruise lines." 1-ER-22. It therefore determined that they were required to satisfy the requirements for third-party standing, and that they had not done so. 1-ER-21-27. As to CLIA, meanwhile, the court concluded that CLIA's members have a "plain, speedy and efficient" mechanism for challenging the cruise-ship tax (though not the registration fees or compelled-speech requirements) in state court, and therefore found that the Tax Injunction Act stripped it of jurisdiction over CLIA's direct challenge to the tax. 1-ER-29 (quoting 28 U.S.C. § 1341); *see* 1-ER-29-37.

4.     Following the district court's decision, Plaintiffs filed motions with this Court seeking an injunction pending appeal that would prevent Act 96's cruise-ship provisions from taking effect on January 1, 2026. This Court granted that relief on December 31, 2025. *See* Order, ECF No. 11.1 (Dec. 31, 2025). The Court recognized that the standard for an injunction pending appeal "is similar to that employed . . . in deciding whether to grant a

19

preliminary injunction." *Id.* at 2 (quoting *Feldman v. Arizona Sec'y of State's Off.*, 843 F.3d 366, 367 (9th Cir. 2016) (en banc)); *see id.* (citing *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Finding that standard met here, the Court held that "[e]nforcement of Hawaii's Act 96" against cruise ships should be "enjoined pending resolution of these appeals, subject to further consideration by the merits panel." *Id.*

## SUMMARY OF THE ARGUMENT

Act 96 violates the Rivers and Harbors Act, Tonnage Clause, and First Amendment. It therefore is likely that CLIA will succeed on its challenges to the registration fees and compelled-speech requirements, which the district court recognized it has jurisdiction to decide. And while the court dismissed Private Plaintiffs' challenges to the cruise-ship tax itself on jurisdictional grounds, that aspect of its decision misapplied principles of third-party standing and the Tax Injunction Act. It therefore is likely that Private Plaintiffs will prevail on their challenges to the cruise-ship tax, too. Because allowing enforcement of Act 96 would violate the First Amendment rights of CLIA's members and likely cause substantial economic harms that sovereign immunity could make it impossible to redress fully at final judgment, this

20

Court should order that Act 96's cruise-ship provisions remain enjoined while the case proceeds.

I.     The district court correctly recognized that it has jurisdiction over CLIA's Rivers and Harbors Act and Tonnage Clause challenges to Act 96's registration fees as well as CLIA's First Amendment challenge to the law's compelled-speech requirements, which in turn depends on the lawfulness of the underlying cruise-ship tax. The court erred, however, in its analysis of CLIA's likelihood of success on those claims.

I.A.   The Rivers and Harbors Act generally prohibits States from collecting "taxes, . . . fees, or any other impositions whatever . . . from any vessel . . . operating on any navigable waters subject to the authority of the United States." 33 U.S.C. § 5(b). That broad prohibition covers Act 96's registration fees and cruise-ship tax, which do not come within any of the RHA's three express exceptions. The district court's contrary conclusion rested on multiple errors. The court applied a presumption against preemption, but that presumption cannot override clear text and is in any event inapplicable when "the State regulates in an area such as 'national and international maritime commerce.'" *Knox v. Brnovich*, 907 F.3d 1167, 1174 (9th Cir. 2018) (citation omitted). The court also relied on a single legislator's

21

floor statement to narrow the statute's application, but that was improper in light of the unambiguous statutory text and inconsistent with even the views of the quoted legislator. And while the court drew support from a pair of non-binding cases that gave the RHA a similarly narrow scope, more recent (and careful) decisions have recognized that those cases were "wrongly decided." *Wendella Sightseeing Co.*, 226 N.E.3d at 655.

I.B. Act 96's cruise-ship tax and registration fees also violate the Tonnage Clause. That clause requires States and municipalities to obtain congressional authorization before imposing a "duty of tonnage," a term which the Supreme Court has long interpreted to cover any "charge for the privilege of entering, trading in, or lying in a port." *Clyde Mallory Lines*, 296 U.S. at 265-66. Act 96's registration fees and cruise-ship tax come squarely within that definition and therefore required—but did not receive—congressional authorization. Moreover, Act 96 discriminates against cruise-ship operators, taxing them based on whole categories of expenses (like transportation and included meals) that are not taxed in the context of land-based accommodations.

I.C. Given Act 96's invalidity under the RHA and Tonnage Clause, CLIA is likely to prevail on its First Amendment claim, too. Even the district

court recognized that "[i]f Act 96's charges are indeed violations of the Constitution or the RHA," then "the Notice Requirements constitute impermissible compelled speech because there is no substantial interest in compelling speech related to an unconstitutional law." 1-ER-50.

II.    It also is likely that Private Plaintiffs will succeed on their direct challenges to Act 96's cruise-ship tax. The district court dismissed those claims on jurisdictional grounds, concluding that the Hawaiʻi-based Plaintiffs' claims improperly relied on third-party standing and that CLIA's claims were barred by the Tax Injunction Act. Both conclusions were incorrect. The Hawaiʻi-based Plaintiffs established that Act 96 would cause them concrete, non-speculative harm, and the court erred in finding that their challenges rested on the legal rights of others. *See* Part II.A. CLIA's members, meanwhile, lack the "plain, speedy and efficient remedy" in state court that is necessary to trigger application of the Tax Injunction Act, 28 U.S.C. § 1341, meaning that the district court had jurisdiction over CLIA's challenge to the tax as well. *See* Part II.B.

III.   Once this Court finds that it is likely Private Plaintiffs will succeed on their claims, all other factors favor a preliminary injunction. Private Plaintiffs face numerous irreparable harms, including competitive and

operational harms that likely cannot be remedied after final judgment; registration fees that the district court recognized likely cannot be recovered once paid; and "[t]he deprivation of 'First Amendment freedoms,'" which "unquestionably constitutes irreparable injury." *Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1283 (9th Cir. 2023) (citation omitted). Defendants, on the other hand, suffer no cognizable harm from following the Constitution, and the public interest favors granting preliminary injunctions against laws that are likely to be held unconstitutional.

## STANDARD OF REVIEW

This Court "review[s] the denial of a preliminary injunction for abuse of discretion, but . . . review[s] *de novo* the underlying issues of law." *Hubbard v. City of San Diego*, 139 F.4th 843, 849 (9th Cir. 2025) (citation omitted). A court should grant a preliminary injunction when a plaintiff "make[s] a clear showing that 'he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345-46 (2024) (citation omitted). This Court also "has adopted the 'serious questions' test—a 'sliding scale'

24

variant of the *Winter* test." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1190 (9th Cir. 2024).

## ARGUMENT

Act 96 violates the Rivers and Harbors Act, Tonnage Clause, and First Amendment, and it therefore is likely that Plaintiffs will succeed on their claims. The district court's contrary view of the merits was incorrect, as was its separate conclusion that it lacked jurisdiction over a subset of Private Plaintiffs' claims. And the remaining preliminary-injunction factors all fall into place with a judicial determination that Plaintiffs are likely to succeed, as even the court below appeared to recognize. This Court accordingly should reverse the decision below, order that Act 96 be preliminarily enjoined, and allow Private Plaintiffs to pursue all of their claims to final judgment.

I. **CLIA IS LIKELY TO SUCCEED IN SHOWING THAT ACT 96 VIOLATES THE RIVERS AND HARBORS ACT, THE TONNAGE CLAUSE, AND THE FIRST AMENDMENT.**

The central questions in this case are whether Act 96's cruise-ship tax and registration fees violate the Rivers and Harbors Act and the Tonnage Clause. And as the district court acknowledged, "[i]f Act 96's charges are indeed violations of the Constitution or the RHA," then the statute's compelled-speech requirements violate the First Amendment, too, "because

there is no substantial interest in compelling speech related to an unconstitutional law." 1-ER-50 (citing *American Beverage Ass'n v. City & County of San Francisco*, 916 F.3d 749, 756 (9th Cir. 2019) (en banc)). But while the district court rightly recognized that it had jurisdiction to consider all of those questions on the merits, its assessment of Plaintiffs' likelihood of success on each of them was incorrect.

### A. The Rivers And Harbors Act Preempts Act 96.

"[C]onsideration of [the Rivers and Harbors Act claims] starts with the text . . . and given the clarity of th[e] provision's language, could end there as well." *Tapia v. United States*, 564 U.S. 319, 326 (2011).

1. The text of the Rivers and Harbors Act unambiguously prohibits the registration fees and 14% tax that Act 96 establishes for cruise ships. In the RHA, Congress established a general rule that "[n]o taxes, tolls, operating charges, fees, or any other impositions whatever shall be levied upon or collected from any vessel . . . , or from its passengers or crew, by any non-Federal interest, if the vessel . . . is operating on any navigable waters subject to the authority of the United States." 33 U.S.C. § 5(b). Act 96's registration fees and 14% tax obviously qualify as "fees" and "taxes," respectively. *Id.* There is likewise no doubt that cruise ships are "vessels," and that Hawai'i's

26

ports sit in "navigable waters subject to the authority of the United States." *Id.*; *see* 33 C.F.R. § 329.4 ("Navigable waters of the United States are those waters that are subject to the ebb and flow of the tide and/or are presently used . . . to transport interstate or foreign commerce."). And the ordinary meaning of the word "operating" makes clear that "a vessel is 'operating' on federal waters when it is engaged in active business thereon.'" *City of Chicago v. Wendella Sightseeing, Inc.*, 143 N.E.3d 771, 777 (Ill. App. Ct. 2019); *see* operating (adjective), Merriam-Webster Dictionary Online ("engaged in active business"), https://www.merriamwebster.com/dictionary/operating.[3] By imposing fees and taxes on vessels actively engaged in business in Hawai'i's ports, therefore, Act 96 does exactly what the Rivers and Harbors Act prohibits.

Congress has established three explicit exceptions to the Rivers and Harbors Act's general prohibition, but none of them applies here. Specifically, States and localities may impose: (1) "fees charged under [33 U.S.C. § 2236]" for port or harbor dues used to pay for completed harbor navigation

---

[3] That is consistent with federal regulations in effect at the time that the relevant provision of the RHA was enacted in 2002, which provided that "[o]perate, *operating*, or *operation*, as applied to vessels, refers to a vessel anytime passengers are embarked whether the vessel is underway, at anchor, made fast to shore, or aground." 46 C.F.R. § 15.301(a) (2002).

27

construction projects; (2) certain "reasonable fees . . . used solely to pay the cost of a service to the vessel"; and (3) "property taxes on vessels." 33 U.S.C. § 5(b)(1)-(3). As the district court recognized, Defendants have never argued that the registration fees or 14% tax come within any of those exceptions—nor could they. *See* 1-ER-72 n.12 (noting that "[t]here are also several exceptions [in the RHA's text], but the State does not rely on any of them here"). And "'[w]here Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied.'" *EEOC v. Peabody W. Coal Co.*, 773 F.3d 977, 989 (9th Cir. 2014) (quoting *Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616-17 (1980)).

2. Given the Rivers and Harbors Act's unambiguous text, other courts have recognized that Congress intended to preempt all state and local impositions on vessels—even ones that apply evenhandedly to maritime and non-maritime businesses alike—unless they fall within one of the explicit statutory exceptions.

In *Wendella Sightseeing Co. v. City of Chicago*, 226 N.E.3d 636 (Ill. App. Ct. 2023), for example, the court held that Chicago's generally applicable amusement tax violated the Rivers and Harbors Act as applied to a boat-tour operator, even though that tax also applied to land-based amusements. *See id.*

28

at 650-59. Chicago had argued that the Rivers and Harbors Act preempted only "a tax on the vessel" itself, while leaving local governments free to tax "the business revenue or income of the company" that operated the vessel, but the court disagreed. *Id.* at 651. It explained that the Rivers and Harbors Act "expressly carves out exceptions for fees related to the service or maintenance of the vessel, as well as property taxes," but contains no similar exception for taxes on the operator's business revenue. *Id.* at 652. "If Congress believed that there should be additional exceptions to this general prohibition," the court explained, "it would have continued to delineate them therein." *Id.*

Likewise, in *Kittatinny Canoes, Inc. v. Westfall Township*, No. 183 CV 2013, 2013 WL 8563483 (Pa. Com. Pl. May 6, 2013), the court held that the Rivers and Harbors Act preempted a generally applicable municipal amusement tax as applied to watercraft operating on the Delaware River. *Id.* at *12. The defendant municipality had argued that the tax was not preempted because it "taxes the admission to 'amusements' on 'dry land' generally and neither specifically targets nor applies only to apply to watercraft on the Delaware River." *Id.* at *14. The court, however, found that to be "a distinction without a difference." *Id.* "[B]ased on a plain reading of the statute

29

and its exceptions," the court determined "that Congress intended to preempt taxes such as the Amusement Tax." *Id.* at \*11.

Finally, in *High Country Adventures, Inc. v. Polk County*, No. E2007-02678-COA-R3-CV, 2008 WL 4853105 (Tenn. Ct. App. Nov. 10, 2008), and *Moscheo v. Polk County*, No. E2008-01969-COA-R3-CV, 2009 WL 2868754 (Tenn. Ct. App. Sept. 2, 2009), two different courts held that the Rivers and Harbors Act preempted the application of a county amusement tax to operators of whitewater rafting excursions. As the court in *High Country Adventures* explained, there was "a manifest conflict between [the] County's local privilege tax which levies a tax on a consumer participating in rafting excursions on navigable waters in the county and requires collection of the tax by the operator of such excursion" and the Rivers and Harbors Act, which "prohibits the levying and collection of a tax from any vessel or water craft operating on any navigable waters subject to the authority of the United States or from its passengers or crew." 2008 WL 4853105, at \*13. The court in *Moscheo* agreed that there was an "inescapable conflict between the [amusement tax] and [the Rivers and Harbors Act]." 2009 WL 2868754, at \*16.

30

3. Notwithstanding the Rivers and Harbors Act's broad text and the decisions above giving effect to that text, the district court here concluded that it is unlikely that Plaintiffs will succeed on their RHA claims. *See* 1-ER-71-77. That conclusion rested on multiple errors.

*First*, the district court started its analysis with "a general presumption that Congress does not intend to preempt state law unless expressly stated." 1-ER-71. As this Court has explained, however, "there is no presumption against preemption when the State regulates in an area such as 'national and international maritime commerce,' where 'the federal interest has been manifest since the beginning of our Republic and is now well established.'" *Knox v. Brnovich*, 907 F.3d 1167, 1174 (9th Cir. 2018) (quoting *United States v. Locke*, 529 U.S. 89, 99 (2000)). And even in contexts where it does apply, the presumption comes into play only "when the text of a pre-emption clause is susceptible of more than one plausible reading." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008). For the reasons discussed above, there is no plausible reading of the RHA that would avoid preemption here—and thus no work for the presumption (even if it applied) to do.

*Second*, the district court asserted that "when, as here, the text of the statute offers few clues as to its scope," "legislative history often plays a role

31

in the preemption calculus." 1-ER-71. The court then proceeded to consider a "statement from a member of [C]ongress" indicating "that the RHA was intended to 'address the current problem, and the potential for greater future problems, of local jurisdictions seeking to impose taxes and fees on vessels *merely transiting or making innocent passage through* navigable waters subject to the authority of the United States that are adjacent to the taxing community.'" 1-ER-74 (citation omitted; emphasis added by district court). And the court appeared to conclude that because Act 96 does not target vessels for "merely transiting" through Hawaiʻi waters—the legislator's central concern—it does not come within the RHA's scope.

That analysis was flawed from start to finish. As an initial matter, it is not true that "the text of the statute offers few clues as to its scope." 1-ER-71. The text offers *numerous* clues about the statute's scope—and all of them point toward breadth. For example, Congress's repeated uses of "any"—"*any* . . . impositions whatever" levied upon "*any* vessel" in "*any* navigable waters" of the United States by "*any* non-Federal interest"—demonstrate its intention to cast a wide net. *See Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008) ("[T]he word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" (citation omitted)). And Congress's

32

"express enumeration" of three carefully calibrated exceptions "indicates that other exceptions should not be implied." *In re Gerwer*, 898 F.2d 730, 732 (9th Cir. 1990). "Absent an express provision declaring invalid *any* state or local taxes on watercraft operating on navigable waters, Congress could scarcely have been more clear about its intention to deny state and local governments the ability to levy taxes on watercraft operating on navigable waters." *Wendella Sightseeing Co.*, 226 N.E.3d at 653 (citation omitted). There was therefore no need to resort to legislative history. *See EEOC v. Luce, Forward, Hamilton & Scripps*, 345 F.3d 742, 753 (9th Cir. 2003) (en banc) (recognizing that where a statute "is unambiguous, we are precluded from considering legislative history").

Having erred in looking to legislative history in the first place, the district court compounded its error by misreading that history. The court understood the statement quoted above to suggest that Congress was concerned *only* about jurisdictions taxing vessels that were "merely transiting or making innocent passage through navigable waters . . . adjacent to the taxing community." 1-ER-74 (citation and emphasis omitted). But while such taxes may have been the immediate impetus for the legislation, the legislative history shows that Congress understood that its new, broadly worded

33

prohibition would reach most other taxes, too. Indeed, the same legislator quoted by the district court went on to observe that "[g]enerally, taxes will not be allowed under this section," with non-federal interests permitted to "impose taxes or fees only under . . . extremely limited circumstances" set out in the express exceptions. 148 Cong. Rec. E2143-44 (2002) (Rep. Young). The legislative history thus favors, rather than undermines, application of the statutory prohibition here.

*Third*, the district court stated that giving full effect to the RHA's broad text "would lead to absurd results" because it would "prevent any taxes whatsoever . . . on any boat that ever spent time in one of Hawaii's ports." 1-ER-72. Wrong again. As discussed above, the Rivers and Harbors Act contains express exceptions permitting port or harbor dues, service fees, and property taxes. 33 U.S.C. § 5(b)(1)-(3). And the idea that Congress did not intend *additional* exceptions for taxes and fees like the ones at issue here is hardly absurd; on the contrary, the legislative history just discussed shows that Congress fully understood that the broad language it was adopting meant that "[g]enerally, taxes will not be allowed under this section." 148 Cong. Rec. E2144; *see In re Hokulani Square, Inc.*, 776 F.3d 1083, 1088 (9th Cir. 2015) (recognizing that the absurdity doctrine "is confined to situations where it is

34

quite impossible that Congress could have intended the result" suggested by the statute's plain meaning (internal quotation marks omitted)). The district court was not at liberty to contradict Congress's choice based on its own view of wise tax policy.

*Fourth*, the district court pointed to two non-binding decisions for the broad proposition that "in those few cases where the plaintiffs tried to challenge a broadly or generally applicable state tax as preempted by the RHA, courts have rejected the attempts." 1-ER-72; *see* 1-ER-73-76 (discussing *Reel Hooker Sportfishing, Inc. v. State, Dep't of Taxation*, 236 P.3d 1230 (Haw. Ct. App. 2010), and *State v. North Pacific Fishing, Inc.*, 485 P.3d 1040 (Alaska 2021)). That description of RHA precedent is inaccurate: As the cases collected above demonstrate, most courts to have considered the RHA's application in those circumstances have held that it preempts even generally applicable state taxes. *See* pp. 26-29, *supra*.[4] And while *Reel Hooker* and

---

[4] The district court observed that "neither Plaintiff cites any cases for their interpretation of the RHA." 1-ER-72. But that was because, throughout most of the briefing in district court, Defendants offered no meaningful defense of Act 96 on the merits and instead relied on procedural objections that the court largely rejected. Indeed, across more than 50 pages of briefing in support of Defendants' motion to dismiss Private Plaintiffs' complaint and in opposition to Private Plaintiffs' motion for a preliminary injunction, Defendants offered just two materially identical footnotes about the merits of the RHA question, asserting in each that "the challenged conduct here does

*North Pacific Fishing* did attempt to distinguish between charges that are "specifically for the use of navigable waters" and charges imposed "on the business the ship was engaged in," 1-ER-73, 1-ER-75, other courts have recognized that the RHA's text draws no such distinction. *See Wendella Sightseeing Co.*, 226 N.E.3d at 645 (explaining that allowing state and local governments to avoid the Rivers and Harbors Act's prohibitions by reframing taxes on vessels as taxes on a vessel operator's revenue "would render the statute 'rather toothless, indeed meaningless,' and thus 'contrary to the express wishes of Congress'" (citation omitted)). They have therefore explained that *Reel Hooker* and *North Pacific Fishing* are "wrongly decided," resting on a mistaken reading of legislative history rather than the RHA's text. *Id.* at 655 (discussing *Reel Hooker*); *see id.* at 657 (observing that *North Pacific Fishing* "engaged in the same impermissible analysis as . . . *Reel*

---

not fall within the intended scope of the RHA." *See* ECF No. 53, at 19 n.5 (Sept. 19, 2025); ECF No. 55, at 18 n.8 (Sept. 26, 2025). It was only in their later response to the United States' motion for a preliminary injunction that Defendants attempted to make a (somewhat) more sustained defense on the merits to the RHA claims. *See* ECF No. 98, at 14-17 (Dec. 15, 2025). Private Plaintiffs had no opportunity to respond to that argument, and the United States had just one day to prepare its reply. *See* ECF No. 93 (Dec. 5, 2025) (setting one-day reply deadline).

*Hooker*;" focusing on "the comments of a single congressperson" rather than the statutory text).

*Finally*, the district court posited that the Rivers and Harbors Act preempts only "discriminatory" impositions, not those that apply equally to land-based property. 1-ER-75. As discussed below, that interpretation would not save Act 96's 14% tax, which treats cruise ships materially worse than accommodations on land. *See* pp. 40-44, *infra*. But more to the point, it disregards the actual terms of the statutory prohibition, which cover not only *discriminatory* impositions but "any . . . impositions whatever." 33 U.S.C. § 5(b).[5] Had the district court applied that broad prohibition as written, rather than laboring to find an unwritten exception, it would have recognized that Plaintiffs are likely to succeed in showing that the RHA preempts Act 96's registration fees and cruise-ship tax.

---

[5] To the extent that the district court implicitly drew its "discriminatory" requirement from the Supreme Court's discussion of the Tonnage Clause in *Polar Tankers, Inc. v. City of Valdez*, 557 U.S. 1 (2009), that was mistaken: *Polar Tankers* was decided more than six years after Congress amended the Rivers and Harbors Act, and therefore cannot have provided the backdrop against which Congress was legislating. Moreover, Defendants conceded below that the Rivers and Harbors Act is "distinct from" the Tonnage Clause and that the two provisions "should be viewed as separate." 2-ER-115.

B.   The Tonnage Clause Also Prohibits Hawaiʻi's Taxation Of Cruise Ships For Time Spent In Hawaiʻi Ports.

Because Plaintiffs are likely to succeed on their RHA challenges, this Court need not reach the Tonnage Clause claims in order to reverse the district court's denial of a preliminary injunction. If the Court does reach those claims, though, it is likely that Plaintiffs will succeed in establishing that Act 96 violates the Tonnage Clause, too.

1.   The Tonnage Clause provides that "[n]o State shall, without the Consent of Congress, lay any Duty of Tonnage." U.S. Const. Art. I, § 10, cl. 3. The term "duty of tonnage" originates from the pre-constitutional practice of imposing shipping fees calculated based on the "internal cubic capacity of a vessel." *Clyde Mallory Lines v. Alabama ex rel. State Docks Comm'n*, 296 U.S. 261, 265 (1935). The Supreme Court has long recognized, however, that as used in the Constitution, the term "embrace[s] all taxes and duties regardless of their name or form, and even though not measured by the tonnage of the vessel, which operate to impose a charge for the privilege of entering, trading in, or lying in a port." *Id.* at 265-66. The Framers required congressional authorization of such taxes in order to prevent the "conflicting obligations" that arose under the Articles of Confederation, when individual States were free to "lev[y] duties on imports and exports and duties of tonnage" that

38

interfered with the free flow of commerce to other States. *State Tonnage Tax Cases*, 79 U.S. (12 Wall.) 204, 214 (1871); *see id.* (observing that "it was the embarrassments growing out of such regulations and conflicting obligations which mainly led to the abandonment of the Confederation"); *see also Polar Tankers, Inc. v. City of Valdez*, 557 U.S. 1, 18 (2009) (Roberts, C.J., concurring in part and concurring in the judgment) ("[The] constitutional ban on tonnage duties . . . reflects the high value the Framers placed on the free flow of maritime commerce.").[6]

Act 96's registration fees and cruise-ship tax are both "charge[s] for the privilege of entering, trading in, or lying in a port," and therefore qualify as duties of tonnage. *Clyde Mallory Lines*, 296 U.S. at 265-66. The registration fee must be paid "as a condition precedent to engaging or continuing in the business of furnishing transient accommodations" in any Hawai'i port. HRS § 237D-4(a). The cruise-ship tax is expressly based on a vessel's "days docked at any port in the State." Act 96 § 5.1. And neither one has any connection to services actually provided to the vessel, instead serving the "general, revenue-

---

[6] Because the Tonnage Clause is concerned only with "duties," it does not prohibit charges for actual "services rendered to and enjoyed by the vessel," such as wharfage fees, pilotage charges, water services, and the like. *Clyde Mallory Lines*, 296 U.S. at 266.

raising purpose" that the Supreme Court has described as characteristic of tonnage duties. *Polar Tankers*, 557 U.S. at 10 (majority op.); *see id.* ("[W]here a tax otherwise qualifies as a duty of tonnage, a general, revenue-raising purpose argues in favor of, not against, application of the Clause.").

Under the text of the Tonnage Clause, that is "the end of the matter." *Id.* at 17-18 (Roberts, C.J., concurring in part and concurring in the judgment). Because the registration fees and cruise-ship tax come within the historical understanding of a "Duty of Tonnage," Hawai'i cannot impose them "without the Consent of Congress." U.S. Const. Art. I, § 10, cl. 3. And because Congress has provided no such consent, Plaintiffs are likely to succeed in establishing that the registration fees and cruise-ship tax are unconstitutional.

2.      The district court held otherwise based on dicta in *Polar Tankers* suggesting that the Tonnage Clause was intended to "protect[] vessels, and their owners, from discrimination by seaboard States," and thus "cannot be read to give vessels . . . 'preferential treatment'" as compared to land-based property. 557 U.S. at 9 (majority op.); *see* 1-ER-63-70. That was error twice over. First, it applied the wrong legal standard. And second, even assuming that the Tonnage Clause focuses narrowly on protecting vessels from

40

discrimination, Act 96's cruise-ship tax still is unconstitutional because it treats cruise ships materially worse than land-based accommodations.

a.　　In *Polar Tankers*, the Supreme Court addressed a "personal property tax" imposed without congressional consent by the City of Valdez, Alaska, on "[b]oats and vessels of at least 95 feet in length" that "regularly travel" to the city. 557 U.S. at 5. The tax "contain[ed] exceptions that, in effect, limit[ed] the tax's applicability primarily to large oil tankers." *Id.*

The Court held the tax invalid in a fractured decision. Justice Breyer, writing for a plurality of four justices, surmised that the Tonnage Clause might allow a property tax imposed on vessels "*in the same manner* as [on] other personal property owned by citizens of the State." *Id.* at 12 (plurality op.). But Justice Breyer admitted that whether a same-manner exception might exist was a hypothetical question that the Court did not actually need to resolve: "[W]e need not decide this issue because it is clear that the vessels subject to the City's ordinance are not taxed in the same manner as other personal property." *Id.* at 16.

Justice Alito joined Justice Breyer's opinion in part (making him the critical fifth vote for the limited majority opinion in that case), but wrote

41

separately to make clear that he was not endorsing a "same manner" exception to the Tonnage Clause:

> I join the opinion of the Court, except for Part II-B-2, which might be read to suggest that the tax at issue here would be permitted under the Tonnage Clause if the tax were a property tax levied in the same manner on other personal property within the jurisdiction. It is sufficient for present purposes that the Valdez tax is not such a personal property tax and therefore, even if the Tonnage Clause permits a true, evenhanded property tax to be applied to vessels, the Valdez tax is an unconstitutional duty of tonnage.

*Id.* at 19-20 (Alito, J., concurring in part and concurring in the judgment).

Finally, Chief Justice Roberts (joined by Justice Thomas) squarely rejected the view that the Tonnage Clause includes a "same manner" or nondiscrimination exception. *Id.* at 17-19.

The district court here acknowledged that the question of "whether the extension of a generally applicable tax . . . to [vessels] violates the Tonnage Clause . . . was never definitively answered in *Polar Tankers*," but tentatively determined "that the answer to that question is 'no.'" 1-ER-63. That was incorrect. As Chief Justice Roberts explained, "the Clause says nothing about discrimination, and it should hardly come as a surprise that a constitutional ban on tonnage duties would give preferential treatment to vessels," given "the

42

high value the Framers placed on the free flow of maritime commerce." *Id.* at 18.

Where a tax satisfies the Court's longstanding definition of a "duty of tonnage," therefore, the fact that similar taxes also apply to land-based property does not eliminate the Tonnage Clause's requirement that the State or locality obtain Congress's approval before applying it to vessels passing through their jurisdiction. And while Congress could categorically approve such non-discriminatory taxes on vessels, it has not done so.

b. Just as in *Polar Tankers*, however, this Court need not definitively resolve whether the Tonnage Clause covers the application of non-discriminatory taxes to vessels. Even assuming that an exception for such taxes exists, Act 96 does not tax cruise ships "in the same manner" as other property. *Polar Tankers*, 557 U.S. at 12 (plurality op.) (emphasis omitted). Instead, Act 96 requires cruise-ship operators to pay the 14% tax on significant categories of expenses that are not taxed in the context of land-based accommodations.

As explained above, *see* pp. 8-11, *supra*, Act 96 requires cruise-ship operators to pay the 14% tax on the value of not only onboard accommodations, but also everything else encompassed in an all-inclusive cruise fare—expressly

43

covering "shipboard services, facilities, meals, and onboard entertainment." Act 96 § 4.1. With respect to all-inclusive (or "American plan") hotels on land, by contrast, Hawai'i "[e]xclude[s]" from taxation the portion of the overall charge attributable to "guest amenities," which specifically include "meals" and "beverages." HAR § 18-237D-1-03(c); *see* American plan (noun), Merriam-Webster Dictionary Online ("a hotel plan whereby the daily rates cover the costs of the room and three meals"), https://www.merriam-webster.com/dictionary/American%20plan. An illustrative example in the regulations recognizes that excluding those "amenities" can reduce the tax owed substantially, stating that removing the value of meals alone could lower a hotel's tax by 25%. *See* HAR § 18-237D-1-03(c) (Example 4). Act 96 thus results in significantly higher taxes for cruise ships than for hotels.

The district court stated that it "views the method of tax calculation for cruise lines as at least similar to that for land-based accommodations" and asserted that "any difference stems from distinctions between how those businesses typically charge." 1-ER-70. But as the provisions just discussed show, that is incorrect: If a hotel and cruise ship each charged $200 for an all-inclusive package that includes accommodations worth $150 and three meals worth $50, the hotel would pay a 14% tax on just $150, while the cruise-ship

44

operator would pay the 14% tax on the full $200. *See* HAR § 18-237D-1-03(c) (Example 4).

In addition, Act 96 also taxes the cost of transportation that cruise ships provide to their passengers—another expense that is not taxed in the context of land-based accommodations. Payment for transportation makes up a significant portion of a cruise fare. *See* pp. 10-11, *supra*. Cruise ships not only provide transpacific transportation to and from Hawaiʻi, but also often provide convenient transportation among the islands themselves that would otherwise be possible only by air. "Apart from purchasing numerous inter-island flights and spending parts of several days in airports," for example, NCL's inter-island cruises aboard "*Pride of America* offer[] one of the few practical ways visitors to Hawaiʻi can see so many islands during a single trip." 2-ER169-170. And as discussed above, guidance issued by Defendant Hawaiʻi Department of Taxation indicates that Act 96 would impose the 14% tax on the full fare, including the cost of transportation. *See* pp. 10-11, *supra*. For a visitor who followed a comparable itinerary among the islands but stayed in hotels and traveled by air, on the other hand, the 14% tax would apply only to the cost of accommodations, not the cost of transportation.

The differential treatment of meals, beverages, and transportation is fatal to Act 96. Even under the broadest version of the *Polar Tankers* dicta, a "tax on ships escapes the scope of the Tonnage Clause only when that tax is imposed upon ships 'in the same manner' as it is imposed on other forms of property." 557 U.S. at 15 (plurality op.). Because Act 96's 14% tax on cruise ships does not satisfy that requirement (and has not received congressional approval), it is unconstitutional.

The district court worried that enjoining enforcement of Act 96 against cruise-ship operators would give them "preferential treatment over land-based businesses offering short-term accommodations." 1-ER-70. But the same argument could have been made in *Polar Tankers*. There, the City of Valdez pointed to other taxes applicable to land-based property that it contended were similar to the tax imposed on oil tankers. *See* 557 U.S. at 12-14 (plurality op.). In a sense, striking down the tax on oil tankers while leaving those other taxes in place gave the tankers preferential treatment, because they were freed from taxation while the other property was not. But any concern about preferential treatment did not stop the Supreme Court from finding that the Tonnage Clause prohibited the discriminatory tax on oil tankers there, *see id.* at 16 (majority op.), and it should not have stopped the

46

district court from doing so with respect to the discriminatory tax on cruise ships here, either.

### C. Given Act 96's Invalidity Under The Rivers And Harbors Act And Tonnage Clause, It Is Likely That CLIA Will Prevail On Its First Amendment Claim, Too.

If this Court agrees that Act 96's cruise-ship tax violates the Rivers and Harbors Act or the Tonnage Clause, it follows that Act 96's compelled-speech requirements also violate the First Amendment.

"[T]he First Amendment guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what *not* to say." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796-97 (1988). Even in the commercial context, therefore, States may compel speech only when, among other things, "the compelled disclosure is 'reasonably related' to a substantial governmental interest." *American Beverage Ass'n*, 916 F.3d at 755 (citation omitted); *see Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1275 (9th Cir. 2023).

As the district court recognized, it follows that CLIA's First Amendment claim likely will succeed if Private Plaintiffs prevail on their arguments about either the Rivers and Harbors Act or the Tonnage Clause. Specifically, "[i]f Act 96's charges are indeed violations of the Constitution or

the RHA," then "the Notice Requirements constitute impermissible compelled speech because there is no substantial interest in compelling speech related to an unconstitutional law." 1-ER-50; *see Washington v. Trump*, 145 F.4th 1013, 1037 (9th Cir. 2025) (holding that the government has "no legitimate interest" in enforcing unconstitutional laws (citation omitted)).

\* \* \*

For the foregoing reasons, it is likely that Plaintiffs will prevail on all of the claims as to which the district court recognized (correctly) that it could exercise jurisdiction—namely, CLIA's challenges to the registration fees and the compelled-speech requirements, and the United States' challenges to the registration fees and the cruise-ship tax. *See* 1-ER-14-15.

## II. THE DISTRICT COURT ERRED IN DECLINING TO EXERCISE JURISDICTION OVER PRIVATE PLAINTIFFS' OTHER CLAIMS.

The district court separately determined that it lacked jurisdiction over the subset of asserted claims involving Private Plaintiffs' direct challenges to the cruise-ship tax itself. 1-ER-14-15. Because the United States also has challenged that tax and sought a preliminary injunction against its enforcement, this Court can order the tax enjoined even without correcting the district court's jurisdictional ruling. But the Court also should reverse the

48

dismissals and clarify that the Hawai'i-based Plaintiffs and CLIA may maintain direct challenges to the cruise-ship tax, too.

### A. The Doctrine Of Third-Party Standing Provides No Basis For Refusing To Hear The Hawai'i-Based Plaintiffs' Claims.

The district court dismissed the Hawai'i-based Plaintiffs' claims under the doctrine of third-party standing. 1-ER-21-27. That was incorrect. Even the district court recognized that the Hawai'i-based Plaintiffs have established their own Article III injuries flowing from enforcement of Act 96. And contrary to that court's understanding, the Hawai'i-based Plaintiffs assert their own legal rights, not the rights of others, as the basis for their challenge.

1. Article III requires that any plaintiff identify "an injury in fact— a concrete and imminent harm to a legally protected interest, like property or money—that is fairly traceable to the challenged conduct and likely to be redressed by the lawsuit." *Biden v. Nebraska*, 600 U.S. 477, 489 (2023). As the district court correctly recognized, the Hawai'i-based Plaintiffs have satisfied those Article III requirements here. *See* 1-ER-18-21.

Each of the three Hawai'i-based Plaintiffs operates a business that depends either entirely or in substantial part on cruise ships and cruise-ship passengers. Plaintiff Aloha Anuenue Tours LLC operates motorcoach tours of the Big Island of Hawai'i designed specifically for cruise-ship passengers,

who make up 100% of its customer base. *See* 2-ER-280. Plaintiff Kaua'i Kilohana Partners operates Kilohana Plantation on the island of Kaua'i, a popular attraction that offers scenic train rides, rum tastings, artisan shops, and luaus. *See* 2-ER-284-285. Passengers from cruise ships docking in the nearby port of Nawiliwili, Hawai'i, generate a substantial portion of Kilohana Plantation's annual revenue. *See id.* Finally, Plaintiff Honolulu Ship Supply Co. ("Honship") offers ship provisioning, technical supplies, waste management, and custom services for vessels, primarily in Honolulu Harbor. *See* 2-ER-274-275. Roughly half of Honship's revenue comes from providing services to cruise ships. *See* 2-ER-275.

Because the Hawai'i-based Plaintiffs' businesses are so closely tied to the cruise industry, a material reduction in cruise-ship traffic or the number of cruise-ship passengers would cause them "classic pocketbook injur[ies]" of the sort long recognized as sufficient to establish Article III standing. *Tyler v. Hennepin County*, 598 U.S. 631, 636 (2023). And the district court found ample evidence in the record below demonstrating that Act 96 will cause such reductions: State officials have acknowledged that Act 96's cruise-ship tax will result in higher prices for the vast majority of cruise-ship passengers, "[a]nd it's not speculative that higher costs for passengers might depress cruise

50

business and on-shore spending." 1-ER-20. For example, after NCL began including the cost of the cruise-ship tax in its *Pride of America* fares, booking revenue dropped approximately 30% relative to the comparable period a year earlier. *See* 2-ER-168; 1-ER-20 n.6. And during debates prior to the passage of Act 96, a representative of Hawai'i's official tourism agency admitted that imposing a tax "based on the total time the cruise ship is docked at any port in the State" was "likely to reduce the number of stops that cruise lines would want to visit between the islands, which could significantly reduce the amount of on-island spend through excursions, shopping, etc." Hearing on S.B. 1396 Before the H. Comm. on Fin., 2025 Leg., 33d Sess. (Haw. 2025) (statement of Caroline Anderson, Interim President & CEO, Haw. Tourism Auth.), https://perma.cc/9TW8-KFJV. Rejecting Defendants' Article III objections, the district court therefore (correctly) found that the Hawai'i-based Plaintiffs had Article III standing to bring their claims because injuries flowing from "the economic effects of Act 96 fall into the predictable rather than the speculative category." 1-ER-20.

2.      The district court should have stopped there: Where Article III jurisdiction exists, "a federal court's 'obligation' to hear and decide a case is 'virtually unflagging.'" *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 77 (2013)

(quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)); *see Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014).

Instead, the district court turned to "prudential standing concerns" as a basis for dismissing the Hawai'i-based Plaintiffs' claims. 1-ER-21. Notwithstanding its finding that the Hawai'i-based Plaintiffs had shown "their own *harms*" for Article III standing purposes, the court concluded that they were relying on the "legal *rights* of the cruise lines" and therefore needed to satisfy prudential third-party-standing requirements to proceed. 1-ER-22. In particular, the court asserted that the Tonnage Clause and Rivers and Harbors Act protect only vessels, not "non-vessel-related businesses," and therefore provide no legal basis for redressing the Hawai'i-based Plaintiffs' claims. 1-ER-25; *see* 1-ER-23-26.

That assertion was incorrect. Contrary to the district court's understanding, the Tonnage Clause and Rivers and Harbors Act are intended to protect more than just vessels and their owners. To be sure, vessels and vessel owners are the most immediate beneficiaries of those provisions, just as the President is the most immediate beneficiary of the Constitution's executive removal power and just as the States are the most immediate beneficiaries of

the Tenth Amendment's reservation of rights. *See Seila Law LLC v. CFPB*, 591 U.S. 197, 213-15 (2020); *Bond v. United States*, 564 U.S. 211, 221-22 (2011). But much like those other structural protections are designed to "protect[] individual liberty" more broadly, *Bond*, 564 U.S. at 223, so too the Tonnage Clause and Rivers and Harbors Act are intended to protect commercial interests extending beyond just vessels and vessel owners.

As the Supreme Court explained a century and a half ago, the Framers intended the Tonnage Clause to supplement the Commerce Clause in shielding "commerce between the States," *S.S. Co. v. Portwardens*, 73 U.S. (6 Wall.) 31, 33 (1867) (discussing the Tonnage Clause), and to "promote . . . prosperity" in commerce, *Inman S.S. Co. v. Tinker*, 94 U.S. 238, 245 (1877) (same). *See Polar Tankers*, 557 U.S. at 18 (Roberts, C.J., concurring in part and concurring in the judgment) (observing that the "constitutional ban on tonnage duties . . . reflects the high value the Framers placed on the free flow of maritime commerce"); Erik M. Jensen, *Quirky Constitutional Provisions Matter: The Tonnage Clause,* Polar Tankers*, and State Taxation of Commerce*, 18 Geo. Mason L. Rev. 669, 716 (2011) (explaining that the Tonnage Clause "is part of the structure intended to ensure federal control over commerce"). And this Court has explained that the Rivers and Harbors

53

Act has similar purposes, not designed narrowly to "confer rights on a particular class of persons" but instead intended to protect "the free movement of commerce" more generally. *Lil' Man in the Boat, Inc. v. City & County of San Francisco*, 5 F.4th 952, 960-61 (9th Cir. 2021) (citation omitted).

Entities like the Hawai'i-based Plaintiffs that depend on the cruise industry (or other types of maritime commerce) for all or a substantial portion of their revenue thus are intended beneficiaries of the Tonnage Clause and Rivers and Harbors Act, too, whether or not they operate vessels themselves. And just as private parties who suffer Article III injuries as a result of violations of the removal power or the Tenth Amendment can invoke those structural provisions on their own, *see Collins v. Yellen*, 594 U.S. 220, 245 (2021); *Bond*, 564 U.S. at 223, so too can the Hawai'i-based Plaintiffs invoke the legal protections of the Tonnage Clause and Rivers and Harbors Act when Hawai'i causes them harm through the improper exercise of authority that has been reserved to the federal government. *See Warth v. Seldin*, 422 U.S. 490, 505 (1975) ("When a governmental prohibition or restriction imposed on one party causes specific harm to a third party, harm that a constitutional provision or statute was intended to prevent, the indirectness of the injury does not necessarily deprive the person harmed of standing to vindicate his

54

rights."); *Collins*, 594 U.S. at 245 ("[W]henever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge."); *Bond*, 564 U.S. at 223 ("If the constitutional structure of our Government that protects individual liberty is compromised, individuals who suffer otherwise justiciable injury may object.").[7]

The Third Circuit's decision in *Maher Terminals, LLC v. Port Authority of New York & New Jersey*, 805 F.3d 98 (3d Cir. 2015), on which the district court relied (1-ER-25), does not suggest otherwise. The Third Circuit there referenced third-party standing only in a footnote, and in fact held that the district court there had "erred" in "link[ing]" a purported "zone of interests" test to prudential standing. 805 F.3d at 105, 109 n.7; *see Lexmark*, 572 U.S. at 125-26 (holding that the "zone of interests" test at most relates to whether there is a "legislatively conferred cause of action," not to standing). In the

---

[7] The district court distinguished *Bond* on the ground that there, the individual was "subject to" the unconstitutional criminal statute. 1-ER-26. But the *right* Bond asserted was her right to "the constitutional structure of our Government that protects individual liberty," specifically the structure of state sovereignty. 564 U.S. at 223. Bond could sue to vindicate that right without triggering third-party-standing concerns because she was personally injured by the violation of that constitutional structure. Similarly here, the Hawaiʻi-based Plaintiffs have established concrete and particularized injuries traceable to violations of the Tonnage Clause and Rivers and Harbors Act.

same footnote, the Third Circuit confirmed that the case turned not on third-party standing, but rather on the fact that there simply was no Tonnage Clause or Rivers and Harbors Act violation to assert in the first place because the complaint—which focused on rent paid by Maher's land-based port terminal—left it "unclear . . . whether any vessels [we]re actually paying unconstitutional tonnage duties." 805 F.3d at 109 n.7. Such a case has no bearing here, where there plainly are Tonnage Clause and Rivers and Harbors Act violations and where the Hawaiʻi-based Plaintiffs have alleged predictable Article III injuries closely connected to the maritime commerce that those provisions exist to protect.

B. The Tax Injunction Act Does Not Bar CLIA's Challenges To The Cruise-Ship Tax.

The district court likewise erred in holding that the Tax Injunction Act bars CLIA's challenge to the cruise-ship tax. The Tax Injunction Act provides that "district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." 28 U.S.C. § 1341. The critical question here is whether Hawaiʻi offers CLIA's members a "plain, speedy and efficient" mechanism for challenging the cruise-ship tax in state court. In answering that question affirmatively, the district court relied on two

procedures a CLIA member could theoretically employ: (i) "withhold[ing] payment of the tax until it receives an assessment and then appeal[ing] the assessment"; or (ii) "seek[ing] a refund of taxes paid and appeal[ing] any denial or failure to act on a refund request." 1-ER-30 (citing HRS §§ 232-14.5, 237D-10, 237D-11, 235-114). Considered correctly, however, neither procedure satisfies the Tax Injunction Act's "plain, speedy and efficient" standard.

1. The assessment procedure is not "speedy." To be "speedy," a state-court remedy must "not entail a significantly greater delay than a corresponding federal procedure." *Hyatt v. Yee*, 871 F.3d 1067, 1073 (9th Cir. 2017) (citation omitted). Here, challenging an assessment in Hawai'i court could take over four years: Act 96 requires cruise-ship operators to begin making monthly payments in January 2026, *see* HRS § 237D-6, but state and county tax authorities would not be required to make an assessment of withheld tax until *April 2030, see* HRS § 237D-9; 2-ER-311-312. Federal civil cases in Hawai'i, by contrast, are resolved on average in well under half that time. *See* Jud. Conf. of the United States, *National Judicial Caseload Profile*, Hawaii (Mar. 2025), https://perma.cc/HHN3-QNHC. By any measure, the assessment procedure imposes significantly greater delay and thus fails to

57

satisfy the "speedy" requirement. *Cf. Rosewell v. LaSalle Nat'l Bank*, 450 U.S. 503, 529 (1981) (Blackmun, J., concurring) (providing fifth vote to bar a federal suit where Illinois courts provided relief within two years, but observing that the state remedy "perhaps only barely" satisfied the Tax Injunction Act).

The district court held otherwise by ignoring the "not significantly greater" standard and instead simply comparing to cases allowing lengthy delays. *See* 1-ER-35. Those cases, however, provided the wrong comparator. The "not significantly greater" standard does not contemplate comparing to the longest delays allowed anywhere in the country (comparing to other States' procedures and other federal district courts with potentially different congestion characteristics). Rather, the standard asks whether Hawaiʻi's assessment procedure would impose "significantly greater delay" as compared to litigation in the federal District of Hawaiʻi. *Hyatt*, 871 F.3d at 1073. It would—and so the assessment procedure does not qualify as "speedy" in the circumstances of this case.

2. For two separate reasons, the refund procedure is likewise inadequate.

*First*, the refund procedure provides no "plain" remedy for the 3% portion of the tax imposed by the Counties. "For a remedy to be 'plain'" within

the meaning of the Tax Injunction Act, "the procedures available in state court must be certain." *Hyatt*, 871 F.3d at 1073 (citation omitted). Here, county ordinances affirmatively authorize appeals of tax assessments but say nothing about appeals of county-level refund denials. Haw. Cnty. Code § 2-265; Kaua'i Cnty. Code § 5-4.12; Maui Cnty. Code § 3.47.120; Rev. Ord. Hon. § 8A-1.16. As a result, any possibility of state-court review of refund denials by the Counties is not "certain." *Hyatt*, 871 F.3d at 1073. Implicitly acknowledging that reality, the district court relied only on the assessment procedure—not the refund procedure—to hold that CLIA's challenges to the 3% county surcharges were barred. *See* 1-ER-31, 1-ER-37. If this Court agrees that the assessment procedure is not "speedy" for the reasons described above, therefore, then the challenges to the county-level portion of the tax, at a minimum, should be allowed to proceed.

*Second*, the refund procedure also is not "efficient." Act 96 results in monthly and annual filing obligations with five different taxing authorities, each of which requires separate filings from even related cruise-ship operators. *See* 1-ER-312-313. As Private Plaintiffs explained in detail below, the result is that some CLIA members could be required to make hundreds of tax filings every year just to remain in compliance and preserve the two

59

federal-law claims asserted here. *Id.* But Supreme Court precedent makes clear that States cannot require such pointless and excessive paper pushing just to obtain resolution of federal rights: In *Georgia Railroad & Banking Co. v. Redwine*, 342 U.S. 299 (1952), the Court held the Tax Injunction Act inapplicable on "efficien[cy]" grounds where a taxpayer otherwise would have been required to file "three hundred separate claims in fourteen different counties to protect [a] single federal claim," *id.* at 303.

In refusing to apply *Redwine* here, the district court credited Defendants' theory that "a member could instead just file a refund action related to its yearly return" or "initiate a refund action relating to the first month of the State Tax it pays." 1-ER-36. But that misunderstood the scheme that Hawaiʻi and the Counties have established. Pursuing one of those paths would not exempt CLIA's members from complying with Act 96's multitudinous monthly payment requirements for however long it took the Hawaiʻi courts to adjudicate the refund action, meaning that a member could still be required to make hundreds of filings to ensure compliance while pressing its federal claims. Under *Redwine*, taxpayers are not shut out from

60

federal court when a State's alternative requires such egregious inefficiency. *See* 342 U.S. at 303.[8]

## III. THE REMAINING PRELIMINARY-INJUNCTION FACTORS HEAVILY FAVOR RELIEF.

As the discussion above shows, it is likely that Private Plaintiffs and the United States will succeed on their Tonnage Clause, Rivers and Harbors Act, and First Amendment challenges. Once this Court corrects the district court's view of the merits, it is clear that the remaining preliminary-injunction factors overwhelmingly favor relief. *See Starbucks Corp. v. McKinney*, 602 U.S. 339, 345-46 (2024).

### A. Plaintiffs Face Irreparable Harm.

Plaintiffs face several forms of irreparable harm, each of which independently supports injunctive relief.

*First*, absent a preliminary injunction, CLIA's members will suffer compelled-speech harms for months (at least). And "[t]he deprivation of 'First

---

[8] *Air Polynesia, Inc. v. Freitas*, 742 F.2d 546 (9th Cir. 1984), does not change that result. While this Court there held that the Hawai'i courts provided sufficient remedies for federal claims in the specific circumstances presented, it had no occasion to address any of the issues discussed above concerning delay, inefficiency, or the unavailability of appeals from county-level refund denials. *See id.* at 548-49. As the district court recognized, therefore, *Air Polynesia* "is not dispositive" of CLIA's challenge to the cruise-ship tax. 1-ER-33.

Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Nat'l Ass'n of Wheat Growers*, 85 F.4th at 1283 (citation omitted); *see American Beverage Ass'n*, 916 F.3d at 758 (recognizing that a "colorable First Amendment claim is irreparable injury sufficient to merit the grant of relief" (citation omitted)).

*Second*, CLIA's members and the Hawaii-based Plaintiffs face irreparable harms in the form of business losses that they may not be able to recoup after final judgment. One of CLIA's members already experienced a 30% drop in bookings on inter-island cruises after raising prices in anticipation of Act 96's cruise-ship tax. *See* 2-ER-168. Other cruise lines likewise will lose customers if Act 96 takes effect. *See* 2-ER-251-253; 2-ER-265-266. And the Hawai'i-based Plaintiffs will suffer lost customers and lost spending even from those customers who do still choose to cruise to Hawai'i. *See, e.g.*, 2-ER-281-282; p. 48, *supra* (describing state tourism official's admission that Act 96 will cause reduced "on-island spend").

While such economic injuries generally do not establish irreparable harm when they can be remedied after the fact with damages, this Court has recognized that "where parties cannot typically recover monetary damages flowing from their injury . . . economic harm can be considered irreparable."

*E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021); *see Washington*, 145 F.4th at 1036 (similar). Here, because of sovereign immunity, Private Plaintiffs would be unlikely to recoup the full measure of their losses even if Act 96 eventually is held preempted or unconstitutional—and Defendants certainly have not explained how Private Plaintiffs could be made whole. The significant damage to Private Plaintiffs' businesses that Act 96 would cause if it takes effect therefore supports a finding of irreparable harm.

*Third*, the registration fees also would cause irreparable harm because (as the district court found) Hawai'i provides no clear mechanism for recovering those fees once paid. *See* 1-ER-46-47.

*Finally*, Private Plaintiffs face irreparable harms from operational disruptions that could not be undone after final judgment. Cruise-ship operators and cruise passengers both plan cruise voyages far in advance. 2-ER-255-256; 2-ER-268-269. Absent a preliminary injunction, CLIA's members will need to plan future cruises in view of Act 96's "powerful incentives to reduce the number of cruises offered to Hawai'i" and to "reduce the number of days that at least some cruises stop in Hawai'i." 2-ER-257. Those changes would be "extremely difficult to undo even if Act 96 eventually is ruled unconstitutional." *Id.* And the Hawai'i-based Plaintiffs similarly face

63

operational harms: Given its thin operating margins, for example, Plaintiff Honship faces a serious risk of layoffs if Act 96 causes even one or two fewer cruise ships to visit Hawai'i. 2-ER-276. Such injuries support the entry of preliminary injunctive relief, particularly where (as here) there are limits on the district court's ability to award damages at final judgment. *See, e.g.,* *American Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1058 (9th Cir. 2009) (harms to "nature of [plaintiff's] business" and need to "unwind[]" changes after judgment showed irreparable harm); *American Ass'n of Univ. Professors v. Trump*, No. 25-CV-07864-RFL, 2025 WL 3187762, at \*36 (N.D. Cal. Nov. 14, 2025) ("layoffs of team members" were irreparable); *Power Probe Grp., Inc. v. Innova Elecs., Corp.*, No. 2:21-CV-00332-GMN-EJY, 2023 WL 7043388, at \*13 (D. Nev. Oct. 25, 2023) ("workforce reduction" supports irreparable harm).

## B. The Equities And The Public Interest Favor Relief.

The public interest and balance of equities strongly favor injunctive relief, too. Where "the nonmovant is the government," these "last two . . . factors 'merge.'" *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023). And when plaintiffs are likely to succeed on a constitutional claim, the merged factors both support relief: "[I]t is always in the public interest to prevent the violation

64

of a party's constitutional rights," so "[a] plaintiff's likelihood of success on the merits of a constitutional claim also tips the merged third and fourth factors decisively in his favor." *Id.* at 1042 (citation omitted).

Defendants, meanwhile, "cannot suffer harm from an injunction that merely ends an unlawful practice," *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013), and "cannot reasonably assert that [they are] harmed in any legally cognizable sense by being enjoined from constitutional violations," *Baird*, 81 F.4th at 1042 (citation omitted).

The balance of harms thus overwhelmingly favors relief. Defendants cannot be harmed by being required to follow federal law. And Defendants' nonexistent harm must be weighed against not only the compelled speech, business, and operational harms facing Private Plaintiffs, but also harms to third parties, including cruise passengers (who face higher prices caused by illegal taxes) and other Hawai'i workers and businesses (who depend on cruises for their livelihoods and employment).

This Court should forestall all those unlawful harms, reverse the decision below, and order that Act 96 be enjoined pending final judgment.

## CONCLUSION

The Court should reverse the district court's dismissal of Private Plaintiffs' challenges to the cruise-ship tax and remand with instructions to enter a preliminary injunction barring enforcement of Act 96 against cruise-ship operators.

Dated: January 20, 2026

Respectfully submitted,

*/s/ Benjamin W. Snyder*

Jeffrey S. Portnoy
Trever K. Asam
Lindsay N. McAneeley
CADES SCHUTTE LLP
1000 Bishop Street, Suite 1200
Honolulu, HI 96813
(808) 521-9200

Bradley J. Bondi
Benjamin W. Snyder
Ronald K. Anguas, Jr.
Joseph C. Schroeder
PAUL HASTINGS LLP
2050 M Street, NW
Washington, DC 20036
(202) 551-1700
bensnyder@paulhastings.com

*Counsel for Plaintiffs-Appellants*

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** | 25-8057

The undersigned attorney or self-represented party states the following:

○ I am unaware of any related cases currently pending in this court.

○ I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

◉ I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

> Cruise Lines International Association, Inc., et al. v. Suganuma, et al., No. 25-8058 (United States' appeal from from same district-court order denying motions for preliminary injunction)

**Signature** | /s/ Benjamin W. Snyder   **Date** | January 20, 2026

*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 17** | *New 12/01/2018*

## UNITED STATES COURT OF APPEALS
### FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 25-8057

I am the attorney or self-represented party.

**This brief contains** | 13,901 | **words, including** | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

⦿ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [          ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Benjamin W. Snyder | **Date** | January 20, 2026

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

I hereby certify that, on January 20, 2026, I caused the foregoing brief to be electronically filed with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit via the ACMS system and that service on all counsel of record will be accomplished by the ACMS system.

/s/ Benjamin W. Snyder
Benjamin W. Snyder

# ADDENDUM

## Table of Contents

Page

U.S. Const. Art. I, § 10, cl. 3 ............................................................................ Add. 1

U.S. Const. Amend. I........................................................................................ Add. 1

28 U.S.C. § 1341 .............................................................................................. Add. 1

33 U.S.C. § 5(b)................................................................................................ Add. 2

Excerpts of Hawai'i Act 96 (2025).................................................................. Add. 3

   § 2 ................................................................................................................ Add. 3

   § 4 ................................................................................................................ Add. 4

   § 5 ................................................................................................................ Add. 5

   § 6 ................................................................................................................ Add. 7

## U.S. Const. Art. I, § 10, cl. 3 (Tonnage Clause).

No State shall, without the Consent of Congress, lay any Duty of Tonnage, keep Troops, or Ships of War in time of Peace, enter into any Agreement or Compact with another State, or with a foreign Power, or engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay.

## U.S. Const. Amend. I.

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

## 28 U.S.C. § 1341 (Tax Injunction Act).

The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State.

Add. 1

**33 U.S.C. § 5(b) (Rivers and Harbors Act).**

        \* \* \*

(b)    No taxes, tolls, operating charges, fees, or any other impositions whatever shall be levied upon or collected from any vessel or other water craft, or from its passengers or crew, by any non-Federal interest, if the vessel or water craft is operating on any navigable waters subject to the authority of the United States, or under the right to freedom of navigation on those waters, except for—

    (1)    fees charged under section 2236 of this title;

    (2)    reasonable fees charged on a fair and equitable basis that—

        (A)    are used solely to pay the cost of a service to the vessel or water craft;

        (B)    enhance the safety and efficiency of interstate and foreign commerce; and

        (C)    do not impose more than a small burden on interstate or foreign commerce; or

    (3)    property taxes on vessels or watercraft, other than vessels or watercraft that are primarily engaged in foreign commerce if those taxes are permissible under the United States Constitution.

Add. 2

Approved by the Governor       Act 096
on May 27, 2025       S.B. No. 1396
The Senate       S.D. 3
Thirty-Third Legislature, 2025       H.D. 3
State of Hawaii       C.D. 2

## A BILL FOR AN ACT
### RELATING TO ECONOMIC DEVELOPMENT.

## BE IT ENACTED BY THE LEGISLATURE
## OF THE STATE OF HAWAII:

\* \* \*

SECTION 2. Chapter 37, Hawaii Revised Statutes, is amended by adding a new section to part IV to be appropriately designated and to read as follows:

"**§37—** **Climate change and tourism destination management; projects; budget request.** The governor shall request, in the budget or the supplemental budget submitted to the legislature pursuant to section 37-71 or 37-72, that an amount of general funds that approximates the additional revenue generated by any increase to the transient accommodations tax rates pursuant to section 237D-2(a)(6) and (c)(4) beginning on January 1, 2026, and section 237D-2(e) beginning on July 1, 2026, and by assessment of the transient accommodations tax on gross rental proceeds derived from cruise fares pursuant to section 237D-2(a) be expended equally to advance specific projects to:

(1) Protect, manage, and restore the State's natural resources, including native forests, native plants and animals, aquatic resources, coastal lands, and freshwater resources;

(2) Increase the resilience of structures and infrastructure to natural and climate-related disasters, such as hurricanes and sea level rise, and perform hazard mitigation activities, such as wildfire and flood mitigation; and

(3) Improve the visitor experience, mitigate the impacts of tourism on the natural environment, ensure that the State's natural resources are maintained for future residents and visitors, and support destination management, such as park improvements and beach improvement, nourishment, and maintenance projects."

Add. 3

\* \* \*

SECTION 4. Section 237D-l, Hawaii Revised Statutes, is amended as follows:

1. By adding three new definitions to be appropriately inserted and to read:

" "Cruise fare" means the total amount paid by a transient for a cruise ship cabin on a cruise ship, inclusive of any mandatory fees imposed by a cruise ship operator, owner, or representative thereof on a transient for the use of shipboard services, facilities, meals, and onboard entertainment, but does not include optional charges for shipboard services, meals, excursions, and onboard entertainment beyond the mandatory fee amount.

"Cruise ship" means any ship that docks at any port in the State that charges a fee for and provides cruise ship cabins to transients.

"Cruise ship cabin" means an accommodation or living quarter on a cruise ship that is provided to a transient."

2. By amending the definition of "gross rental" or "gross rental proceeds" to read:

"Gross rental" or "gross rental proceeds" means the gross receipts, cash or accrued, of the taxpayer received as compensation for the furnishing of transient accommodations or entering into arrangements to furnish transient accommodations and the value proceeding or accruing from the furnishing of transient accommodations or entering into arrangements to furnish transient accommodations, including resort fees without any deductions on account of the cost of property or services sold, the cost of materials used, labor cost, taxes, royalties, interest, discounts, or any other expenses whatsoever. "Gross rental" or "gross rental proceeds" includes the gross receipts derived from cruise fares. Every taxpayer shall be presumed to be dealing on a cash basis unless the taxpayer proves to the satisfaction of the department of taxation that the taxpayer is dealing on an accrual basis and the taxpayer's books are so kept, or unless the taxpayer employs or is required to employ the accrual basis for the purposes of the tax imposed by chapter 237 for any taxable year in which event the taxpayer shall report the taxpayer's gross income for the purposes of this chapter on the accrual basis for the same period.

The words "gross rental" or "gross rental proceeds" shall not be construed to include the amounts of taxes imposed by chapter 237 or this

Add. 4

chapter on operators of transient accommodations, transient accommodations brokers, travel agencies, and tour packagers and passed on, collected, and received from the consumer as part of the receipts received as compensation for the furnishing of transient accommodations or entering into arrangements to furnish transient accommodations.

Where transient accommodations are furnished through arrangements made by a transient accommodations broker, travel agency, or tour packager at noncommissionable negotiated contract rates and the gross income is divided between the operator of transient accommodations on the one hand and the transient accommodations broker, travel agency, or tour packager on the other hand, the tax imposed by this chapter shall apply to each operator and transient accommodations broker, travel agency, or tour packager with respect to that person's respective portion of the proceeds and no more.

For purposes of this definition, where the operator maintains a schedule of rates for identifiable groups of individuals, such as kamaainas, upon which the accommodations are leased, let, or rented, gross rental or gross rental proceeds means the receipts collected and received based upon the scheduled rates and recorded as receipts in its books and records."

SECTION 5. Section 237D-2, Hawaii Revised Statutes, is amended as follows:

1. By amending subsection (a) to read:

"(a) There is levied and shall be assessed and collected each month a tax of:

(1) Five per cent for the period beginning on January 1, 1987, to June 30, 1994;

(2) Six per cent for the period beginning on July 1, 1994, to December 31, 1998;

(3) 7.25 per cent for the period beginning on January 1, 1999, to June 30, 2009;

(4) 8.25 per cent for the period beginning on July 1, 2009, to June 30, 2010; [and]

(5) 9.25 per cent for the period beginning on July 1, 2010[, and thereafter,] to December 31, 2025; and

(6)     Ten per cent for the period beginning on January 1, 2026, and thereafter,

on the gross rental or gross rental proceeds derived from furnishing transient accommodations[.]; provided that an operator of a cruise ship shall be assessed and pay a tax of eleven per cent under this subsection on all gross rental proceeds derived from cruise fares prorated by the percentage of days docked at any port in the State in comparison to the total number of days of the voyage."

2.     By amending subsection (c) to read:

"(c)     There is levied and shall be assessed and collected each month, on the occupant of a resort time share vacation unit, a transient accommodations tax of:

(1)     7.25 per cent on the fair market rental value until December 31, 2015;

(2)     8.25 per cent on the fair market rental value for the period beginning on January 1, 2016, to December 31, 2016; [and]

(3)     9.25 per cent on the fair market rental value for the period beginning on January 1, 2017, [and thereafter.] to December 31, 2025; and

(4)     Ten per cent on the fair market rental value for the period beginning on January 1, 2026, and thereafter."

3.     By amending subsection (e) to read:

"(e)     Notwithstanding the tax rates established in subsections [(a)(5)] (a)(6) and [(c)(3),] (c)(4), the tax rates levied, assessed, and collected pursuant to subsections (a) and (c) shall be [10.25] eleven per cent for the period beginning on January 1, 2018, to December 31, 2030; provided that:

(1)     The tax revenues levied, assessed, and collected pursuant to this subsection that are in excess of the revenues realized from the levy, assessment, and collection of tax at the [9.25] ten per cent rate shall be deposited quarterly into the mass transit special fund established under section 248-2.7; and

(2)     If a court of competent jurisdiction determines that the amount of county surcharge on state tax revenues deducted and withheld by the State, pursuant to section 248-2.6, violates statutory or

Add. 6

constitutional law and, as a result, awards moneys to a county with a population greater than five hundred thousand, then an amount equal to the monetary award shall be deducted and withheld from the tax revenues deposited under paragraph (1) into the mass transit special fund, and those funds shall be a general fund realization of the State.

The remaining tax revenues levied, assessed, and collected at the [9.25] ten per cent tax rate pursuant to subsections (a) and (c) shall be deposited into the general fund in accordance with section 237D-6.5(b)."

SECTION 6.    Section 2370-6.5, Hawaii Revised Statutes, is amended by amending subsection (b) to read as follows:

"(b) Except for the revenues collected pursuant to section 237D-2(e), revenues collected under this chapter shall be distributed in the following priority, with the excess revenues to be deposited into the general fund:

(1)    $1,500,000 shall be allocated to the Turtle Bay conservation easement special fund beginning July 1, 2015, for the reimbursement to the state general fund of debt service on reimbursable general obligation bonds, including ongoing expenses related to the issuance of the bonds, the proceeds of which were used to acquire the conservation easement and other real property interests in Turtle Bay, Oahu, for the protection, preservation, and enhancement of natural resources important to the State, until the bonds are fully amortized;

(2)    $11,000,000 shall be allocated to the convention center enterprise special fund established under section 201B-8;

(3)    An allocation shall be deposited into the tourism emergency special fund, established in section 201B-10, in a manner sufficient to maintain a fund balance of $5,000,000 in the tourism emergency special fund; and

(4)    $3,000,000 shall be allocated to the special land and development fund established under section 171-19 [; provided that the allocation shall be expended in accordance with the Hawaii tourism authority strategic plan] for:

Add. 7

(A)　The protection, preservation, maintenance, and enhancement of natural resources, including beaches [, important to the visitor industry];

(B)　Planning, construction, and repair of facilities; [and]

(C)　Operation [and], maintenance, and improvement costs of public lands, including beaches[, connected with enhancing the visitor experience.]; and

(D)　Any related debt service and financing agreement costs.

All transient accommodations taxes shall be paid into the state treasury each month within ten days after collection and shall be kept by the state director of finance in special accounts for distribution as provided in this subsection."

　　　＊　＊　＊